# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 32773/37270

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | Boise, November 2012 Term |
| | ) | |
| v. | ) | 2013 Opinion No. 95 |
| | ) | |
| TIMOTHY ALAN DUNLAP, | ) | Filed: August 27, 2013 |
| | ) | |
| Defendant-Appellant. | ) | Stephen Kenyon, Clerk |
| _____ | ) | |
| | ) | |
| TIMOTHY ALAN DUNLAP, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF IDAHO, | ) | |
| | ) | |
| Respondent. | ) | |

Appeal from the District Court of the Sixth Judicial District of the State of Idaho, Caribou County. Hon. Don L. Harding, District Judge.

The judgment imposing the death sentence is <u>affirmed</u>. The district court's summary dismissal of the petition for post-conviction relief is <u>affirmed</u> in part, <u>vacated</u> in part, and <u>remanded</u> for further post-conviction relief proceedings.

Sara B. Thomas, State Appellate Public Defender, Boise, for appellant. Shannon Romero argued.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent. Lamont Anderson argued.

_____

HORTON, Justice.

This matter is a consolidated appeal from the sentence of death imposed upon Timothy A. Dunlap after he pled guilty to first-degree murder and from the district court's summary denial of his petition for post-conviction relief. Dunlap alleges numerous errors by the district court during the jury sentencing proceedings, and he advances several claims of ineffective

1

assistance of counsel. Additionally, the parties ask this Court to determine whether the mandatory review of death sentences governed by Idaho Code § 19-2827 requires the Court to consider errors that were not preserved by objection at trial or whether a defendant must demonstrate fundamental error before those errors may be considered. Dunlap asks this Court to set aside his sentence and remand for resentencing or, in the alternative, to vacate the order summarily dismissing his petition for post-conviction relief and remand for an evidentiary hearing. We affirm the judgment imposing the death sentence. We affirm the district court's summary dismissal of Dunlap's petition for post-conviction relief in part, vacate in part, and remand for further post-conviction relief proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This appeal deals solely with issues related to Dunlap's sentencing. We set forth the factual and procedural background leading to the jury-imposed sentence in a previous appeal:

> On October 16, 1991, Dunlap entered and robbed the Security State Bank in Soda Springs, Idaho. Dunlap entered the bank, stood within a few feet of bank teller Tonya Crane, and ordered her to give him all of her money. Without hesitation, Tonya Crane did so. Dunlap immediately and calmly pulled the trigger of his sawed-off shotgun, which was less than two feet from Tonya Crane's chest, literally blowing her out of her shoes. Police officers responded immediately. When the officers arrived at the bank, Tonya Crane had no pulse. When taken to the hospital she was pronounced dead on arrival.
>
> Dunlap fled the scene, but subsequently surrendered to police. After being given his *Miranda* rights, Dunlap confessed to the murder and to a murder that occurred ten days before in Ohio. The following day, Dunlap again confessed and explained how he planned and completed both murders. Dunlap was charged with first-degree murder and robbery.
>
> Within days of his arrest, Dunlap arranged to be interviewed by Marilyn Young, Associate Editor of the Albany New Tribune in Indiana. During the interviews Dunlap explained to Young how he murdered his girlfriend in Ohio with a crossbow and then traveled west where he subsequently planned to rob the Soda Springs' bank. Dunlap described the bank robbery and Tonya Crane's murder to the editor.
>
> In Idaho on December 30, 1991, Dunlap pled guilty to first-degree murder for shooting Tonya Crane during the course of a robbery. "In the agreement, the State dropped the robbery and use of a firearm in the commission of a robbery charges, and Dunlap pled guilty to first degree murder and use of a firearm in the commission of a murder." *State v. Dunlap,* 125 Idaho 530, 531, 873 P.2d 784, 785 (1993) (*Dunlap I*). The plea agreement allowed the State to seek the death penalty. *Id.*
>
> . . .

2

During the plea colloquy the court questioned Dunlap and his attorneys about Dunlap's mental history and whether it would have any impact on his ability to plead guilty. [The district court then reviewed medical records Dunlap provided related to his mental health.] . . . The district court judge continued with the hearing, but informed the parties he would make his decision about accepting the plea after he had a chance to review the documents. After reviewing the records, the court accepted Dunlap's plea.

. . .

After the aggravation-mitigation hearing the district court imposed the death penalty. Dunlap appealed his conviction and sentence, but this Court affirmed both. *Id.*

On May 12, 1994, Dunlap filed a petition for post-conviction relief. The district court dismissed the petition because it was not filed within forty-two days of entry of judgment. This Court reversed the district court's decision and remanded Dunlap's case for further proceedings. *Dunlap v. State,* 131 Idaho 576, 961 P.2d 1179 (1998) (*Dunlap II*).

Prior to the commencement of the evidentiary hearing, the State conceded that error occurred during Dunlap's sentencing proceeding and he would have to be resentenced. On January 11, 2002, based on the State's concession, the district court ordered a new sentencing hearing be held, but denied Dunlap's guilt-phase post-conviction relief. Dunlap timely appealed from the denial of the post-conviction application.

Upon the State's motion the district court stayed Dunlap's resentencing. Dunlap did not file a notice of appeal challenging the stay.

*Dunlap v. State*, 141 Idaho 50, 55-56, 106 P.3d 376, 381-82 (2004) (*Dunlap III*) (footnote omitted). In *Dunlap III*, this Court upheld the district court's denial of Dunlap's petition for post-conviction relief and the validity of his guilty plea. *Id.* at 66, 106 P.3d at 392. However, we also recognized that in *Ring v. Arizona*, 536 U.S. 584 (2002), the Supreme Court of the United States held that death sentences must be imposed by a jury, not a judge, and remanded the case for resentencing by a jury. *Id.*

The resentencing proceedings began with jury selection on February 6, 2006. The sentencing hearing before the jury was conducted between February 13 and February 22, 2006. Following the presentation of evidence, the jurors were sequestered until their verdict was returned. The jury found that the State proved three statutory aggravating factors beyond a reasonable doubt, specifically: (1) by the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life (I.C. § 19-2515(9)(f)) (the utter disregard aggravator); (2) the murder was committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, kidnapping or mayhem and the defendant had the specific intent to cause the death of a human being (I.C. § 19-2515(9)(g)) (the specific intent aggravator); and (3) the

defendant, by prior conduct or conduct in the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society (I.C. § 19-2515(9)(h))[1] (the propensity aggravator). The jury further found that all the mitigating evidence, weighed against each aggravator, was not sufficiently compelling to make imposition of the death penalty unjust. In accordance with the verdict, the district court entered a judgment sentencing Dunlap to death. On May 27, 2008, Dunlap filed his petition for post-conviction relief. Dunlap unsuccessfully moved to disqualify Judge Harding from the post-conviction case. The State moved for summary dismissal of the petition, which the district court granted on November 24, 2009. In this consolidated appeal, Dunlap's challenges both the judgment and the summary dismissal of his claims for post-conviction relief.

## II. ISSUES ON APPEAL

After the parties' initial briefing was complete, this Court granted the State's request to submit supplemental briefing in response to Dunlap's Reply Brief, in which he argued that Idaho Code § 19-2827 requires this Court to review death sentences for error even if the claimed errors were not raised before the district court. This becomes a threshold issue because twelve of the sixteen sentencing-phase errors Dunlap now advances were not raised during the sentencing proceedings and this Court generally will not consider issues that were not raised at trial unless the defendant demonstrates fundamental error, i.e., "that one of his unwaived constitutional rights was plainly violated." *State v. Perry*, 150 Idaho 209, 226, 245 P.3d 961, 978 (2010). This issue is considered first because its resolution determines which of Dunlap's other claims will be considered.

**Threshold issue: mandatory sentence review under Idaho Code § 19-2827**

1. Whether Idaho Code § 19-2827 requires this Court to review every sentencing error alleged by a capital defendant, even if the error was not raised before the district court, without first applying the fundamental error standard this Court announced in *Perry*.

**Direct appeal issues raised for the first time on appeal**

1. Whether the district court erred by limiting individual voir dire of each potential juror to five minutes for each party.

2. Whether the jury instructions presented the issues and stated the applicable law fairly and adequately.

---

[1] Subsequent to the jury's verdict, the Legislature amended I.C. § 19-2515. The propensity aggravator is now codified at I.C. § 19-2515(9)(i).

3. Whether some jurors' knowledge that Dunlap had previously been sentenced to death for Crane's murder violated Dunlap's due process and Eighth Amendment rights.

4. Whether the district court erred by not sequestering the jury until the case was submitted for deliberation.

5. Whether the district court erred by failing to ensure that all discussions with counsel during the sentencing proceedings were recorded and that Dunlap was present for those discussions.

6. Whether the State's actions in the voir dire examination, opening statement, presentation of evidence and closing argument constituted prosecutorial misconduct.

7. Whether the district court erred by failing to investigate alleged juror misconduct.

8. Whether the district court erred by granting the State's motion to introduce relevant and reliable evidence without applying the Idaho Rules of Evidence.

9. Whether the district court erred by submitting the utter disregard aggravator to the jury.

10. Whether the jury sentencing requirement of *Ring v. Arizona* renders the utter disregard aggravator unconstitutionally vague.

11. Whether the district court's admission of the reports of mental health experts violated Dunlap's Confrontation Clause rights or his privilege against self-incrimination.

12. Whether Idaho's death penalty violates the Eighth Amendment by subjecting mentally ill defendants to death sentences.

**Direct appeal issues properly preserved at the sentencing hearing**

1. Whether the district court abused its discretion by denying Dunlap's motions to excuse two potential jurors for cause.

2. Whether the district court erred in denying Dunlap's motion to appoint a second mental health expert to present live testimony.

3. Whether Dunlap's due process or equal protection rights were violated by the district court's rulings on defense requests for funding for the sentencing proceedings.

4. Whether, if this Court holds that no individual error entitles Dunlap to a new sentencing, the accumulation of sentencing errors violated his rights to due process and a fair trial.

**Post-conviction ineffective assistance of counsel issues**

1. Whether the district court erred by summarily dismissing Dunlap's claim that he was denied effective assistance of counsel by his attorneys' failure to object to the district court's five-minute limit on individual voir dire.

2. Whether the district court erred by summarily dismissing Dunlap's claim that he was denied effective assistance of counsel by his attorneys' failure to redact transcripts referring to Dunlap's prior death sentence and failure to investigate whether any other jurors were aware of the prior sentence.

3. Whether the district court erred by summarily dismissing Dunlap's claim that he was denied effective assistance of counsel by his attorneys' failure to request an investigation into allegations of juror misconduct or by their decision not to question the relevant juror.

4. Whether the district court erred by summarily dismissing Dunlap's claim that he was denied effective assistance of counsel by his attorneys' failure to object to the admission of reports prepared by mental health experts.

5. Whether the district court erred by summarily dismissing Dunlap's claim that he was denied effective assistance of counsel by his attorneys' failure to adequately challenge venue.

6. Whether the district court erred by summarily dismissing Dunlap's claim that he was denied effective assistance of counsel by his attorneys' failure to object to Dunlap being visibly shackled or to the number of law enforcement personnel present at the sentencing.

7. Whether the district court erred by summarily dismissing Dunlap's claim that he was denied effective assistance of counsel by his attorneys' failure to adequately investigate and present mitigation evidence and to adequately rebut the State's aggravation evidence.

8. Whether the district court erred by summarily dismissing Dunlap's claim that he was denied effective assistance of counsel by his attorneys' decision to rely on depositions and prior witness testimony in closing arguments, rather than presenting live witness testimony.

9. Whether the district court erred by summarily dismissing Dunlap's claims that he was denied effective assistance of counsel by his attorneys' decision not to attend Dunlap's interview with Dr. Matthews and because his attorneys did not advise him in preparation for that interview.

10. Whether the district court erred by summarily dismissing Dunlap's claim that he was denied effective assistance of counsel by his attorneys' decisions regarding Dunlap's medications prior to and during sentencing.

11. Whether the district court erred by summarily dismissing Dunlap's claim that he was denied effective assistance of counsel by his attorneys' decisions regarding the preparation and delivery of his allocution statement.

## Other post-conviction issues

12. Whether the district court abused its discretion by denying Dunlap's motion for a discovery order granting him access to the murder weapons for trigger-pull testing.

13. Whether the district court abused its discretion by denying Dunlap's motion to disqualify Judge Harding for cause.

14. Whether the district court erred by summarily dismissing Dunlap's claims of *Brady* and *Napue* violations based upon the State's alleged knowledge of, and failure to disclose, mitigating evidence revealed during Dunlap's federal civil rights action against the Idaho Maximum Security Institution (IMSI).

15. Whether the district court erred by summarily dismissing Dunlap's claim that his constitutional right to a fair trial was violated by the jury's consideration of extrinsic evidence and the jury pool's exposure to biased statements by prospective jurors.

16. Whether the district court's decision to grant the State's summary dismissal motion was improperly influenced by Judge Harding's personal schedule and private commitments.

### III. STANDARD OF REVIEW

Proceedings for post-conviction relief are civil in nature, rather than criminal, and the applicant must therefore prove the allegations in the request for relief by a preponderance of the evidence. *State v. Payne*, 146 Idaho 548, 560, 199 P.3d 123, 135 (2008) (citing I.C. § 19–4907; *Stuart v. State*, 118 Idaho 865, 869, 801 P.2d 1216, 1220 (1990)). "Summary dismissal of a petition for post conviction relief is the procedural equivalent of summary judgment under I.R.C.P. 56 and this Court must determine whether a genuine issue of material fact exists, with inferences liberally construed in favor of the petitioner." *Charboneau v. State*, 140 Idaho 789, 792, 102 P.3d 1108, 1111 (2004) (citing *Saykhamchone v. State*, 127 Idaho 319, 321, 900 P.2d 795, 797 (1995)). When a genuine issue of material fact is shown to exist, an evidentiary hearing must be conducted. *Payne*, 146 Idaho at 561, 199 P.3d at 136 (citing *Gonzales v. State*, 120 Idaho 759, 763, 819 P.2d 1159, 1163 (Ct. App. 1991)). "However, summary dismissal may be appropriate even where the State does not controvert the applicant's evidence because the court is not required to accept either the applicant's mere conclusory allegations, unsupported by admissible evidence, or the applicant's conclusions of law." *Id.* (citing *Roman v. State*, 125 Idaho 644, 647, 873 P.2d 898, 901 (Ct.App.1994)).

"When an appellant asserts the violation of a constitutional right, we give deference to the trial court's factual findings unless those findings are clearly erroneous." *State v. Pearce*, 146 Idaho 241, 248, 192 P.3d 1065, 1072 (2008) (citing *State v. Henage*, 143 Idaho 655, 658, 152 P.3d 16, 19 (2007)). "We exercise free review over the trial court's determination as to whether constitutional requirements have been satisfied in light of the facts found." *Id.*

7

## IV. ANALYSIS

### A. The scope of this Court's mandatory review under Idaho Code § 19-2827.

Most of the sentencing errors Dunlap alleges are raised for the first time on appeal. The State argues that this Court should not address these claims because Dunlap has not shown that they constitute fundamental error as defined in *Perry*, 150 Idaho at 226-28, 245 P.3d 961, 978-80. In response, Dunlap contends that Idaho Code § 19-2827 requires this Court to review all death sentences for error, including procedural error, even if the defendant did not object below. Consequently, Dunlap argues, this Court should not apply *Perry* to his unobjected-to claims, but instead should review all of his claims, without regard to whether they were preserved at the sentencing hearing.

"Statutory interpretation is a question of law over which this Court exercises free review." *Carrillo v. Boise Tire Co., Inc.*, 152 Idaho 741, 748, 274 P.3d 1256, 1263 (2012) (citing *Dyet v. McKinley*, 139 Idaho 526, 529, 81 P.3d 1236, 1239 (2003)). When a question before this Court requires statutory interpretation, we apply the following principles:

> The objective of statutory interpretation is to derive the intent of the legislative body that adopted the act. Statutory interpretation begins with the literal language of the statute. Provisions should not be read in isolation, but must be interpreted in the context of the entire document. The statute should be considered as a whole, and words should be given their plain, usual, and ordinary meanings. It should be noted that the Court must give effect to all the words and provisions of the statute so that none will be void, superfluous, or redundant. When the statutory language is unambiguous, the clearly expressed intent of the legislative body must be given effect, and the Court need not consider rules of statutory construction.

*State v. Schulz*, 151 Idaho 863, 866, 264 P.3d 970, 973 (2011) (quoting *Farber v. Idaho State Ins. Fund*, 147 Idaho 307, 310, 208 P.3d 289, 292 (2009) (internal citations omitted)).

Idaho Code § 19-2827 provides that "[w]henever the death penalty is imposed, and upon the judgment becoming final in the trial court, the sentence shall be reviewed on the record by the Supreme Court of Idaho." I.C. § 19-2827(a). The statute continues, explaining the scope of the review:

> (b) The Supreme Court of Idaho shall consider the punishment as well as any errors enumerated by way of appeal.
> (c) With regard to the sentence the court shall determine:
> > (1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance from among those enumerated in section 19-2515, Idaho Code.

(d) Both the defendant and the state shall have the right to submit briefs within the time provided by the court, and to present oral argument to the court.

(e) In addition to its authority regarding correction of errors, the court, with regard to review of death sentences, shall be authorized to:

(1) Affirm the sentence of death; or

(2) Set the sentence aside and remand the case for resentencing by a jury or, if waived, the trial judge.

(f) The sentence review shall be in addition to direct appeal, if taken, and the review and appeal shall be consolidated for consideration.

I.C. § 19-2827(b)-(f). The plain language of subsection (b) of the statute requires the Court to examine the sentence as a whole, and to consider "any errors enumerated by way of appeal." I.C. § 19-2827(b). Thus, section 19-2827 requires us to review not only issues preserved by way of objection, but all claims of error the defendant raises on appeal. In addition to this requirement, subsection (c) mandates a review to ensure that the sentence was impartially imposed with adequate evidentiary support. However, our review is not unlimited; nothing in the text of the statute requires us to consider errors not presented by the appellant. We hold that this Court's review of capital sentences pursuant to Idaho Code § 19-2827 is not limited to errors preserved at the sentencing. Rather, it is the Court's duty to consider all claims of error raised by the appellant and to review the sentence to ensure that it was imposed free from improper influences and was properly supported by the evidence. Consequently, when reviewing a capital sentence we will address all of the errors a defendant raises, whether preserved by objection or not, but we will not scour the record in an effort to find errors not identified by the defendant.

We must also address the standard we will use in conducting a review under section 19-2827. The State suggests that the policy considerations in capital cases are the same as those outlined in *Perry*, and the fundamental error standard is therefore appropriate in both kinds of cases. However, *Perry* was not a capital case, and thus we had no reason to consider the additional statutory requirements that govern appeals in capital cases.

This appeal presents that opportunity. In *Perry*, we stated our intention to clarify the standards for analyzing trial errors to determine whether the errors were harmless or fundamental, partially to "reinforce the judicial preference for contemporaneous objections at trial." 150 Idaho at 220, 245 P.3d at 972. We explained that the general rule limiting the scope of appellate review to errors that have been preserved before the trial court "serves to induce the

9

timely raising of claims and objections," permits the trial court to attempt to "correct or avoid the mistake so that it cannot possibly affect the ultimate outcome," and discourages a defendant from "sandbagging" or "remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor." *Id.* at 224, 245 P.3d at 976 (quoting *Puckett v. United States*, 556 U.S. 129, 134 (2009)). We then went on to hold:

> [W]here a defendant alleges that an error occurred at trial, appellate courts in Idaho will engage in the following analysis:
>
> . . .
>
> > (2) If the alleged error was not followed by a contemporaneous objection, it shall only be reviewed by an appellate court under Idaho's fundamental error doctrine. Such review includes a three-prong inquiry wherein the defendant bears the burden of persuading the appellate court that the alleged error: (1) violates one or more of the defendant's unwaived constitutional rights; (2) plainly exists (without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision); and (3) was not harmless. If the defendant persuades the appellate court that the complained of error satisfies this three-prong inquiry, then the appellate court shall vacate and remand.

*Id.* at 227-28, 245 P.3d at 979-80. Our reasoning in *Perry* is as applicable in capital cases as in other situations. Indeed, the incentive for "sandbagging" may be even greater in capital cases. We therefore hold that, in the case of unobjected-to error alleged to have occurred during capital proceedings, the defendant bears the burden of proving the existence of an error that was not harmless. With respect to those errors properly preserved by way of objection, the State will have the burden of proving that any error was harmless.

**B. Appeal from the sentencing proceedings.**

As explained above, when this Court considers appeals in capital cases, we will consider the issues the defendant has identified, including those claimed errors raised for the first time on appeal. On review of these unpreserved claims, the defendant has the burden of proving that an error occurred and that the error is not harmless, meaning that the defendant must show that there is a reasonable possibility that the defendant would not have been sentenced to death. *See Perry*, 150 Idaho at 226, 245 P.3d at 978. When reviewing alleged errors that were properly preserved by an objection, we apply the harmless error test, which first requires the defendant to demonstrate that there was an error. Then, upon that showing, the State has the burden of

demonstrating beyond a reasonable doubt that the error[2] did not contribute to the death sentence. *Perry*, 150 Idaho at 227, 245 P.3d at 979.

**1. Issues raised for the first time on appeal.**

*a) Voir dire limits*

Dunlap contends that the district court violated his right to a fair and impartial jury by limiting the parties to five minutes of individual voir dire for each prospective juror. The State replies that the court did not err and, even if there was an error, Dunlap has not shown that the limitation contributed to the jury's verdict.

When this Court reviews limitations a district court places on jury voir dire, it applies an abuse of discretion standard. *State v. Daniels*, 134 Idaho 896, 898, 11 P.3d 1114, 1116 (2000) (citing *State v. Bitz*, 93 Idaho 239, 244, 460 P.2d 374, 379 (1969)). Under that standard, the district court's decision "will be upheld if the court '(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) reached its decision by an exercise of reason.'" *State v. Gurney*, 152 Idaho 502, 503, 272 P.3d 474, 475 (2012) (quoting *Sun Valley Potato Growers, Inc. v. Texas Refinery Corp.*, 139 Idaho 761, 765, 86 P.3d 475, 479 (2004)). The Idaho Criminal Rules provide that "voir dire examination shall be under the supervision of the court and subject to such limitations as the court may prescribe in the furtherance of justice and the expeditious disposition of the case." I.C.R. 24(b). While "[t]here is no absolute constitutional right to individual voir dire in capital cases . . . the method of voir dire must comport with due process requirements." *Wilson v. Sirmons*, 536 F.3d 1064, 1098 (10th Cir. 2008) (citing *Trujillo v. Sullivan*, 815 F.2d 597, 606–07 (10th Cir.1987) *opinion reinstated sub nom. Wilson v. Workman*, 577 F.3d 1284 (10th Cir. 2009)).

In this case, the district court initially ruled that there would be no individual voir dire of prospective jurors. The court subsequently decided to permit the parties to conduct five minutes of individual voir dire of each prospective juror. This demonstrates that the court recognized the decision as discretionary. The court's initial decision was based upon the comprehensive nature of the jury questionnaire and the court's belief that the parties' opportunity to ask follow-up questions of individual jurors based upon their responses to questions directed to the panel

---

[2] In *Perry*, the Court held that the harmless error analysis is applied to all errors which have been the subject of objection, regardless of whether the error is of constitutional dimension. 150 Idaho at 221-22, 245 P.3d at 973-74.

during general voir dire was sufficient to select an unbiased jury. The court's discussion of its reasoning and subsequent decision to allow five minutes of individual voir dire show that it acted within the boundaries of its discretionary authority and was the product of the exercise of reason. We therefore hold that Dunlap has failed to demonstrate error.

*b) Jury instructions*

We review the trial court's jury instructions *de novo* to determine "whether, when considered as a whole, they fairly and adequately present the issues and state the applicable law." *State v. Adamcik*, 152 Idaho 445, 472, 272 P.3d 417, 444 (2012) (quoting *State v. Zichko*, 129 Idaho 259, 264, 923 P.2d 966, 971 (1996)). The instructions are reviewed in this fashion because "'[i]t is well established that [an] instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.'" *Id.* (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)).

Dunlap contends that he was denied his right to fair trial because the jury instructions were vague and ambiguous. Specifically, Dunlap argues that Jury Instruction (J.I.) 1 improperly reduced the State's burden of proof for the specific intent aggravator as it was described in J.I. 9. In J.I. 1, the jury was informed that Dunlap had pled guilty to first-degree murder and recited the charging language from the Information, which stated: "That the defendant, Timothy Alan Dunlap, . . . did willfully, unlawfully and with malice aforethought, kill Tonya Crane, . . . which murder was committed in the perpetration of a robbery." The instruction further stated that the State "must prove at least one statutorily-defined aggravating circumstance beyond a reasonable doubt." The language of J.I. 9 required the jury to find that "[t]he murder was committed in the perpetration of . . . robbery . . . and the defendant had the specific intent to cause the death of a human being." Thus, the jury was first instructed by J.I. 1 that Dunlap "willfully" killed Crane and J.I. 9 then asked the jury whether the State had proved that Dunlap had "the specific intent" to kill her.

There is no "willfulness" requirement relating to the killing in the subsection of Idaho's first-degree murder statute under which Dunlap was charged. *See* I.C. § 18-4003(d). In order to commit felony murder, the defendant need not have had the specific intent to kill. Rather, the defendant must have had the specific intent to commit the predicate felony. *State v. Pina*, 149 Idaho 140, 147, 233 P.3d 71, 78 (2010) (citing *State v. Scroggins*, 110 Idaho 380, 386, 716 P.2d 1152, 1158 (1985)), *abrogated on other grounds by Verska v. Saint Alphonsus Reg'l Med. Ctr.*,

12

151 Idaho 889, 265 P.3d 502 (2011). The common definition of *willful* includes "an intention to commit the particular act." *State v. Draper*, 151 Idaho 576, 589, 261 P.3d 853, 866 (2011). Thus, when the jury was instructed that Dunlap had admitted to "willfully" killing Crane, it was essentially instructed that he "intentionally" killed her. J.I. 1 set the stage for how the jury viewed the rest of its tasks because it purported to outline the conduct Dunlap had admitted to. Therefore, even when viewed in the context of all the instructions, we hold that the district court erred by giving J.I. 1.

This requires us to consider whether this error requires reversal of the judgment sentencing Dunlap to death. The jury found that the State proved two other statutory aggravating circumstances beyond a reasonable doubt and that the mitigating evidence, weighed against each of these other aggravating circumstances, was not sufficiently compelling to make imposition of the death penalty unjust. Thus, this error did not affect Dunlap's sentence. We therefore find the error in J.I. 1 to be harmless.

Next, Dunlap argues that the district court should have instructed the jury that some independent evidence must exist for each aggravator, i.e., that the exact same evidence could not be relied upon to find more than one statutory aggravating circumstance. *State v. Wood*, 132 Idaho 88, 104, 967 P.2d 702, 718 (1998) (citations omitted). Dunlap is correct that this Court has consistently held that precisely the same facts cannot support more than one aggravator because we presume that the legislature did not intend to duplicate aggravating circumstances. *Id*.; *State v. Fain*, 116 Idaho 82, 99, 774 P.2d 252, 269 (1989), *overruled on other grounds by State v. Card*, 121 Idaho 425, 825 P.2d 1081 (1991); *State v. Osborn*, 102 Idaho 405, 418-19, 631 P.2d 187, 200-01 (1981). Thus, we hold that the trial court erred by failing to instruct the jurors that they were required to find independent evidence existed for each aggravator.

We do not, however, find Dunlap's corollary assertion to be persuasive. Dunlap argues: "[T]he only thing we know for sure is that the evidence could support one aggravator, but not all aggravators; we do not know *which specific* aggravator can be supported by the evidence. As a result, none of the aggravators can be relied upon to support the death sentence." We accept Dunlap's implicit premise that the jury may have relied upon the entirety of the evidence in aggravation as supporting each of the three aggravating circumstances they found to be true. However, we do not accept his explicit premise that we don't know which specific aggravator can be supported by the evidence. To the contrary, the entirety of the evidence in aggravation

13

would support the finding of any of the three aggravating circumstances, as the jury's verdict reflects. Although as a matter of law, the jury could not consider all of the evidence in aggravation as supporting each of the aggravators, this simply means that the verdict cannot stand as to all three aggravators, not that all three aggravators are unsupported by the evidence. Because each of the three aggravators was supported by the entirety of the evidence, at least one remains unaffected by the failure to give the required instruction.[3] Thus, we find the error to be harmless.

As to the other jury instruction issues Dunlap raises, we find no error when the instructions are considered as a whole. J.I. 14 instructed the jury that if it found "all mitigating circumstances are sufficiently compelling to make imposition of the death penalty unjust," Dunlap would receive a fixed life sentence rather than the death penalty. Dunlap argues that "sufficiently compelling" should have been defined because the jury might have thought that the phrase required some specific amount of mitigation to overcome the aggravating circumstance. We disagree. It is unnecessary to define "sufficiently compelling" because the phrase is comprised of ordinary words that do not require definition. *See Zichko*, 129 Idaho at 264, 923 P.2d at 971 (citing *State v. Gonzales*, 92 Idaho 152, 156, 438 P.2d 897, 901 (1968)).

Dunlap also contends that the jury should have been required to make written findings. In support of this assertion, Dunlap notes that judges are required to make written findings if jury sentencing is waived. I.C. § 19-2515(8)(b)(i). However that same statute sets forth the jury's responsibilities:

> Upon the conclusion of the evidence and arguments in mitigation and aggravation:
> (a) With regard to each statutory aggravating circumstance alleged by the state, the jury shall return a special verdict stating:
> (i) Whether the statutory aggravating circumstance has been proven beyond a reasonable doubt; and
> (ii) If the statutory aggravating circumstance has been proven beyond a reasonable doubt, whether all mitigating circumstances, when weighed against the aggravating circumstance, are sufficiently compelling that the death penalty would be unjust.

I.C. § 19-2515(8). There is no mention of written findings required of the jury. Further, any concerns about Dunlap's right to meaningful appellate review were addressed in *Clemons v.*

---

[3] The specific intent aggravator is invalid due the error in J.I. 1. We need not decide which of the two remaining aggravators ought to be invalidated.

14

*Mississippi*, where the U.S. Supreme Court held that "[a]n appellate court also is able adequately to evaluate any evidence relating to mitigating factors without the assistance of written jury findings." 494 U.S. 738, 750 (1990). Thus, because the statute specifically requires written findings when the court imposes the sentence, but not when the jury does, we hold that there is no error.

Finally, Dunlap argues that J.I. 10 failed to provide proper guidance to the jury because it did not inform the jury what was necessary to find that Dunlap exhibited an utter disregard for human life. J.I. 10 adopted the language used by the U.S. Supreme Court in *Arave v. Creech*, holding that the narrowing construction applied by Idaho courts was sufficient to render the instruction constitutional. 507 U.S. 463, 471-74 (1993). There was no error in this instruction.

*c) Jurors' knowledge of the prior death sentence*

Dunlap contends that some jurors' knowledge that he had previously been sentenced to death for Crane's murder violated his due process and Eighth Amendment rights by reducing the jury's sense of responsibility for the sentence that was imposed. Relying upon *Caldwell v. Mississippi*, 472 U.S. 320, 340 (1985), Dunlap contends that the jurors' knowledge that he had previously been sentenced to death for Crane's murder impermissibly diminished their sense of responsibility, thereby reducing the reliability of the sentencing verdict. In *Caldwell*, the prosecutor told the jury that it shouldn't be swayed by defense counsel's statement that the defendant's life was in their hands because, as a result of the automatic appeal process, the jury was not the final decision maker. *Id.* at 324-26..

Dunlap's reliance on *Caldwell* is misplaced. The U.S. Supreme Court has "read *Caldwell* as 'relevant only to certain types of comment–those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision.'" *Romano v. Oklahoma*, 512 U.S. 1, 9-10 (1994) (quoting *Darden v. Wainwright*, 477 U.S. 168, 184 n.15 (1986)). The Court then held "[t]hus, '[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.'" *Id.* (second alteration in original) (quoting *Dugger v. Adams*, 489 U.S. 401, 407 (1989)). The Court rejected Romano's argument that the evidence of his prior death sentence undermined the sentencing jury's sense of responsibility, holding that *Caldwell* applies where the jury is "affirmatively misled regarding its role in the sentencing process." *Romano*, 512 U.S. at 9. While Romano was decided in the context of the

jurors' knowledge of a death sentence for separate murder, the holding is equally applicable where the prior sentence was for the same offense because the critical inquiry is whether the jury was "affirmatively misled." *Id.*

In this case, Dunlap has not shown that the jury was misled. Rather, he asserts that their knowledge of his prior conviction somehow diminished their sense of personal responsibility. We hold that this issue is properly considered under *Romano* and, in the absence of evidence that the jury's role in sentencing Dunlap was somehow misrepresented, there was no error.

### *d) Jury sequestration*

Dunlap contends that the district court's decision not to sequester the jury until the case was submitted for deliberation violated his right to a fair and impartial jury. *See, e.g.*, *State v. Stuart*, 110 Idaho 163, 173, 715 P.2d 833, 843 (1985) (holding that the purpose of sequestering a jury is to protect the jury from prejudicial influence) *abrogated on unrelated grounds by State v. Tribe*, 123 Idaho 721, 852 P.2d 87 (1993).

The district court's decision regarding whether to sequester the jury is governed by statute. In cases of first-degree murder, where the death penalty is sought "the jury may not be permitted to separate after submission of the cause and completion of the special sentencing proceeding held pursuant to section 19-2515 or 19-2515A, Idaho Code." I.C. § 19-2126. Thus, under the plain language of the statute, jury sequestration is required only after the cause has been submitted. Idaho Code § 19-2515 provides:

> (5) (a) If a person is adjudicated guilty of murder in the first degree, whether by acceptance of a plea of guilty, by verdict of a jury, or by decision of the trial court sitting without a jury, and a notice of intent to seek the death penalty was filed and served as provided in section 18-4004A, Idaho Code, a special sentencing proceeding shall be held promptly for the purpose of hearing all relevant evidence and arguments of counsel in aggravation and mitigation of the offense. . . . The special sentencing proceeding shall be conducted before a jury unless a jury is waived by the defendant with the consent of the prosecuting attorney.
> (b) If the defendant's guilt was determined by a jury verdict, the same jury shall hear the special sentencing proceeding; provided however, that if it is impracticable to reconvene the same jury to hear the special sentencing proceeding due to an insufficient number of jurors, the trial court may dismiss that jury and convene a new jury of twelve (12) persons, plus alternate jurors as the trial court deems necessary pursuant to section 19-1904, Idaho Code.
> (c) If the defendant's guilt was determined by a plea of guilty or by a decision of the trial court sitting without a jury, or if a retrial of the special sentencing proceeding is necessary for any reason including, but not limited to, a mistrial in a previous special sentencing proceeding or as a consequence of a remand from an

16

appellate court, the trial court shall impanel a jury of twelve (12) persons, plus alternate jurors as the trial court deems necessary pursuant to section 19-1904, Idaho Code, unless such jury is waived.

Reading sections 19-2126 and -2515(5)(b) together, it is clear that in proceedings where the same jury sits for both the guilt and sentencing phases, the jury must be sequestered from the time the question of guilt is submitted until the jury has reached its sentencing decision. However, as contemplated in section 19-2515(5)(c), there are situations, such as in Dunlap's case, where a jury that did not decide the defendant's guilt will be convened for the purpose of sentencing. In those circumstances, the first "cause" submitted to the jury is the sentencing question. Therefore, in these situations, we hold that the language of section 19-2126 requiring the jury to be and remain sequestered "after submission of the cause and completion of the special sentencing proceeding," requires only that the jury be sequestered after the jury has retired to deliberate the questions presented in the special verdict required by I.C. § 19-2515(8)(a).

Here, the jury was sequestered after the evidence was presented and it was charged with determining whether the state had proved one or more aggravators beyond a reasonable doubt and, if so, whether the mitigating evidence was sufficiently compelling as to make imposition of the death penalty unjust. It remained sequestered until it completed its deliberations. Consequently, we hold that Dunlap has failed to demonstrate error.

*e) Recording of certain sentencing proceedings*

Dunlap argues that the district court's failure to ensure that all sentencing proceedings were recorded was a violation of the Idaho Appellate Rules. He also contends that the district court's failure to ensure he was present for all sentencing proceedings violated his right to be present at all critical stages of the proceedings. We disagree.

The U.S. Supreme Court has held that the right to be present at all proceedings is related to ensuring a fair hearing. *See Kentucky v. Stincer*, 482 U.S. 730 (1987). The *Stincer* Court noted that it "has assumed that, even in situations where the defendant is not actually confronting witnesses or evidence against him, he has a due process right 'to be present in his own person whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge.'" *Id.* at 745 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-106 (1934)). However, the Court also noted that this right is not absolute, but that it guarantees a defendant "the right to be present at any stage of the criminal proceeding that is critical to its

17

outcome if his presence would contribute to the fairness of the procedure." *Id*. In *Stincer*, the Court held that the defendant's due process rights were not violated by his absence from a hearing to determine the competency of minor witnesses against him. *Id.* at 747. The Court observed that the defendant had "given no indication that his presence at the competency hearing in this case would have been useful in ensuring a more reliable determination as to whether the witnesses were competent to testify," and consequently, his absence did not compromise the fairness of the hearing.[4] *Id.*

In this case, Dunlap alleges two errors. First, during the presentation of the evidence, the jury requested an instruction related to the aggravating factors. The court minutes reflect that the court met with counsel, advised them of the note, and the parties agreed that the jury would be instructed at the close of evidence. Second, an observer in the courtroom sent a note to the court claiming that she had seen a juror talking on a cellphone and stating that "the State wants us to believe." The court took the observer and counsel for parties into chambers to discuss the note without Dunlap and without recording the discussion. After the meeting, the parties restated for the record what took place, how they wished to proceed, and why.

We first hold that neither of these claims fits within the error defined in *Stincer*. While Dunlap was not present on either occasion, Dunlap has not shown how his presence could have affected the outcome of either hearing. The district court included counsel in both meetings, and in the more substantive meeting regarding the phone call, the contents of the meeting were placed on the record to protect Dunlap's right to meaningful appellate review. Neither meeting appears to be the kind where Dunlap's assistance could have ensured fairer or more reliable proceedings because he did not possess any information related to the claims. Therefore, we conclude that Dunlap has failed to demonstrate error.

Regarding the claim that it was error for the district court not to record the discussion regarding the juror's conduct, we hold that there was no error. The Idaho Appellate Rules require capital proceedings to be preserved for the record. *See* I.A.R. 25(d); 28(b)(2)(O). As noted, counsel for both parties were present and a record was made. Thus, there is no error.

*f) Prosecutorial misconduct*

---

[4] The Court explained that if the competency hearing had been one in which the witness would be "asked to discuss upcoming substantive testimony," the defendant's presence "might bear a substantial relationship to" his ability to assist in his defense, and thus to the fairness of the proceeding. *Stincer*, 482 U.S. at 745-46.

18

The first step in considering Dunlap's claim that certain actions of the State in the sentencing proceedings constituted prosecutorial misconduct is to determine whether any of the alleged conduct actually rises to the level of prosecutorial misconduct.

The general rule is that "both parties are given wide latitude in making their arguments to the jury and discussing the evidence and inferences to be made therefrom." *State v. Severson*, 147 Idaho 694, 720, 215 P.3d 414, 440 (2009) (citing *State v. Sharp*, 101 Idaho 498, 504, 616 P.2d 1034, 1040 (1980)). It is also well-established that "great latitude" is allowed during voir dire questioning. *State v. Lewis*, 126 Idaho 77, 81, 878 P.2d 776, 780 (1994) (quoting *State v. Bitz*, 93 Idaho 239, 243, 460 P.2d 374, 378 (1969)). Counsel also has "latitude in making an opening statement," although the opening statement is generally limited to a summary of the evidence the party intends to introduce on its own behalf and not as an opportunity "to impeach or otherwise argue the merits of" the opposing party's evidence. *State v. Griffith*, 97 Idaho 52, 56, 539 P.2d 604, 608 (1975) (footnotes omitted). There is also "considerable latitude in closing argument," and both sides "are entitled to discuss fully, from their respective standpoints, the evidence and the inferences" that should be drawn from it. *State v. Sheahan*, 139 Idaho 267, 280, 77 P.3d 956, 969 (2003) (citing *State v. Martinez*, 136 Idaho 521, 525, 37 P.3d 18, 22 (Ct. App. 2001)). Unlike an opening statement, in a closing argument, the parties are entitled to explain how, from their own perspectives, "the evidence confirms or calls into doubt the credibility of particular witnesses." *Id.* (citing *State v. Priest*, 128 Idaho 6, 14, 909 P.2d 624, 632 (Ct. App. 1995)). However, the prosecutor may not "express a personal belief as to the credibility of witnesses, unless the comment is based solely on inferences from evidence presented at trial," nor "make personal attacks on defense counsel . . . ." *Id.* (citations omitted).

Dunlap's first complaint relates to the prosecutor's voir dire questioning regarding reasonable doubt. The prosecutor asked jurors whether they would go forward with a "big decision" such as "buying a house or taking a job" if they had a reasonable doubt as to the correctness of the decision. Dunlap correctly argues that the questioning was intended to equate the gravity of the decision that the jury would be asked to make with such decisions. We considered a similar challenge in *State v. Carson*, 151 Idaho 713, 264 P.3d 54 (2011). There, as here, the defendant did not challenge the reasonable doubt instruction given by the trial court. *Id.* at 718, 264 P.3d at 59. Rather, the defendant asserted "that unobjected-to comments by the prosecuting attorney during" closing argument, if accepted by the jury, would have diminished

19

the burden of proof to less than beyond a reasonable doubt. *Id*. We rejected this argument, applying our well-established presumption "that the jury followed the jury instructions given by the trial court in reaching its verdict" and noting that there was "no indication that the jury did not follow the court's instructions." *Id*. (citing *Phillips v. Erhart*, 151 Idaho 100, 109, 254 P.3d 1, 10 (2011)). Our holding in *Carson* was consistent with our view that inappropriate prosecutorial statements may be cured by appropriate instructions by the trial court. *See, e.g.*, *Severson*, 147 Idaho at 722-23, 215 P.3d at 442-43. Although we do not encourage questions such as those posed by the prosecutor in this case, we hold that any prosecutorial error that tended to suggest that the State bore a diminished burden was cured by the district court's instruction regarding the burden of proof.

Dunlap next contends that the prosecutor's assertion in his opening statement that "[n]o amount of evidence from Tim Dunlap's past can outweigh the callous disregard for human life when he killed Tonya Crane" was error because it was an attempt to influence the jury by preemptively telling them that no amount of mitigation evidence could overcome the aggravation evidence. This is an overstatement. Taken in the context of the prosecutor's admonition to examine all of the evidence, the prosecutor's statement was merely an assertion that the State's aggravating evidence was so overwhelming that the mitigating evidence would not be sufficient to make the death penalty unjust in this case.[5] We find no error in this respect.

Dunlap advances a claim of prosecutorial misconduct during the presentation of evidence, arguing that "Dr. Matthews, the State's expert, repeatedly bolstered his own testimony, the reports of non-testifying witnesses with whom he agreed, and repeatedly invaded the province of the jury…." Citing *State v. Perry*, 139 Idaho 520, 81 P.3d 1230 (2003), Dunlap further asserts that expert testimony that encroaches upon the province of the jury "violates a defendant's constitutional right to a jury trial." We first address Dunlap's assertion that erroneous introduction of evidence has constitutional implications before turning our attention to the substantive claims of prosecutorial misconduct related to Dr. Matthews' testimony.

In *Perry*, this Court reiterated a long-standing evidentiary rule:

---

[5] We do not intend to suggest that opening statement is the appropriate time to advance arguments as to the relative weight the jury should give to evidence that is expected to be introduced. "Generally, opening remarks should be confined to a brief summary of evidence counsel expects to introduce on behalf of his client's case-in-chief. Counsel should not at that time attempt to impeach or otherwise argue the merits of evidence that the opposing side has or will present." *Griffith*, 97 Idaho at 56, 539 P.2d at 608.

> Idaho courts have routinely held that "an expert's opinion, in a proper case, is admissible up to the point where an expression of opinion would require the expert to pass upon the credibility of witnesses or the weight of disputed evidence. To venture beyond that point, however, is to usurp the jury's function." *State v. Hester*, 114 Idaho 688, 696, 760 P.2d 27, 35 (1988); *see also State v. Konechny*, 134 Idaho 410, 419, 3 P.3d 535, 544 (Ct. App. 2000).

*Perry*, 139 Idaho at 525, 81 P.3d at 1235. Both cases cited in the foregoing passage involved application of I.R.E. 702. *See Hester*, 114 Idaho at 695, 760 P.2d at 34; *Konechny*, 134 Idaho at 414-20, 3 P.3d at 539-45. *Perry* explicitly applied I.R.E. 702 as the basis for our decision: " 'In general, expert testimony which does nothing but vouch for the credibility of another witness encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not 'assist the trier of fact' as required by Rule 702.' " *Perry*, 139 Idaho at 525, 81 P.3d at 1235 (quoting *U.S. v. Charley,* 189 F.3d 1251, 1267 (10th Cir. 1999)). Nowhere in *Perry* did this Court suggest that erroneous introduction of evidence "violates a defendant's constitutional right to a jury trial." To the contrary, in a different case involving a defendant sharing a common surname, we concluded that although the erroneous introduction of vouching testimony constituted prosecutorial misconduct, we were unable to find a clear constitutional violation. *State v. Perry*, 150 Idaho 209, 229, 245 P.3d 961, 981 (2010) ("We hold that the prosecutor committed misconduct by eliciting vouching testimony from these witnesses. However, the record in this case does not show the clear violation of an unwaived constitutional right.") Certainly, the erroneous admission of some forms of evidence has constitutional significance based upon the nature of the evidence. This would be the case when the State introduces evidence of a defendant's post-arrest silence, *see, e.g.*, *State v. Ellington*, 151 Idaho 53, 59-60, 253 P.3d 727, 733-34 (2011), or that obtained by way of an unlawful search or seizure, *see, e.g.*, *Bitz*, 89 Idaho at 190, 404 P.2d at 633. However, evidentiary errors that simply involve violations of the Idaho Rules of Evidence do not implicate constitutional considerations unless "the error results in the defendant being deprived [of] his or her Fourteenth Amendment due process right to a fair trial in a fair tribunal." *State v. Jones*, 154 Idaho 412, ___, 299 P.3d 219, 224 (2013) (citing *Perry*, 150 Idaho at 224, 245 P.3d at 976).

Dunlap's first complaint regarding Dr. Matthews' testimony relates to an exhibit containing admission by Dunlap that he had feigned mental illness. The prosecutor asked, "In these particular situations, how should that affect the diagnosis of Mr. Dunlap? … What weight should the jury give it?" Dr. Matthews replied:

21

The jury should give these powerful weight. The jury should pay very, very great attention to them because, first of all, it is unusual for people who are malingering to actually admit it. And what you have got here, basically are a bunch of seasoned mental health professionals who admit that Mr. Dunlap pulled the wool over their eyes. And it is only when, you know, when he turned around and said he was faking it that they recognized it. So I think these are some of the most important documents in the record.

The prosecutor's question and Dr. Matthews' response are clear violations of our precedent interpreting I.R.E. 702 as they clearly intruded upon the jury's responsibility to weigh the evidence.

Dunlap contends that the decision in *State v. Walters*, 120 Idaho 46, 813 P.2d 857 (1991), requires that his sentence be vacated in such circumstances. We disagree. We first note that Dunlap has failed to provide us with a specific citation within *Walters*. The citation we have been provided actually relates to two decisions—the initial opinion and that issued upon rehearing. We assume that Dunlap relies on that portion of the decision on rehearing which garnered three votes, as plurality opinions from this Court are not binding on this Court. *Gonzalez v. Thacker*, 148 Idaho 879, 881, 231 P.3d 524, 526 (2009) (citing *Osick v. Pub. Employee Ret. Sys. of Idaho*, 122 Idaho 457, 460, 835 P.2d 1268, 1271 (1992)). The rationale for vacating Walters' conviction is found in Justice Boyle's concurring opinion on rehearing, which gathered three votes:

In my mind, the judgment of conviction must be vacated, not solely on the ground that defense counsel was inadequate, but also on the ground originally raised by the defendant and addressed by this Court in its initial decision—that allowing the expert to testify as to who was guilty of the crime was error so fundamental that it contravenes the defendant's right to a fair trial. When fundamental error occurs in a trial, *it is irrelevant whether that error would have altered the ultimate verdict of the jury.*

*Walters*, 120 Idaho at 59, 813 P.2d at 870 (emphasis added). The standard of review for fundamental error applied in *Walters* has no continued validity subsequent to our decision in *State v. Perry*, 150 Idaho 209, 245 P.3d 961 (2010), nor is it consistent with the standard for error review in capital cases that we have announced today. Although the question and reply constituted prosecutorial misconduct, we find the error to be harmless.

Dunlap next claimed error regarding Dr. Matthews' testimony is advanced in a single sentence: "Dr. Matthews also testified Dr. Brooks' opinion that Mr. Dunlap did not exhibit signs of a formal thought disorder should be given significant weight because Dr. Brooks was a

defense expert who would have been 'looking very, very carefully' for evidence of disorders." If an accurate representation of Dr. Matthews' testimony, Dunlap's claim of misconduct might have merit. However, nowhere in Dr. Matthews' testimony did he suggest the weight the jury ought to give Dr. Brooks' report. Rather, Dr. Matthews was asked whether he found anything significant in Dr. Brooks' report. Dr. Matthews responded by identifying the portions of Dr. Brooks' report that "interested [him] most" and that he found it "interesting" that "prior to his homicides, no one ever thought he had schizophrenia. No one ever thought he had schizo-affective disorder." We find no error in this testimony.

Finally, Dunlap complains that "Dr. Matthews bolstered his own credibility to the jury by testifying he had an 'ethical obligation' of 'honesty and objectivity.' " Dunlap cites no legal authority in support of this claim of error and we have found no reported authority suggesting that a witness's volunteered statement regarding his ethical duties rises to the level of misconduct. Even if such authority existed, it is evident that any error was harmless.

Dunlap next alleges prosecutorial misconduct based upon four aspects of the State's closing argument. The first is the prosecutor's statements regarding whether Dunlap seemed mentally ill at the time of the murder and whether any alleged mental illness contributed to the commission of the crime. Dunlap contends that the prosecutor's statements about his mental illness were error because mitigating evidence does not have to be causally connected to the crime. *Tennard v. Dretke*, 542 U.S. 274, 284 (2004); *State v. Payne*, 146 Idaho 548, 569-70, 199 P.3d 123, 144-45 (2008). Second is the prosecutor's statement that the "cold-blooded, pitiless slayer" language in the jury instruction was "an example" of what is meant by utter disregard for human life. Dunlap claims that the prosecutor's characterization of the "cold-blooded, pitiless slayer" language as merely an example of "utter disregard" for human life is error because that language was the key to the U.S. Supreme Court's determination that the aggravator was constitutional. *Arave v. Creech*, 507 U.S. 463, 468 (1993). Third, Dunlap contends that the prosecution twice impermissibly argued that a death sentence was mandatory under Idaho law. Dunlap argues that this was a misstatement of the law because a death sentence is never required by Idaho law; rather, a life sentence for first degree murder is presumed, and death may be imposed only if the circumstances warrant it. *State v. Charboneau*, 116 Idaho 129, 154, 774 P.2d 299, 324 (1989), *overruled on other grounds by State v. Card*, 121 Idaho 425, 825 P.2d 1081 (1991). Finally, Dunlap argues that the State's focus on Dunlap's "continuing threat to society,"

rather than "prison society" when discussing the propensity aggravator was  misconduct, citing *Kelly v. South Carolina*, 534 U.S. 246 (2002), and *Simmons v. South Carolina*, 512 U.S. 154 (1994).

In response to Dunlap's first claim of misconduct in closing arguments, the State correctly acknowledges that *Tennard* and *Payne* stand for the proposition that mitigation evidence is not irrelevant simply because there is no nexus between the evidence and the defendant's commission of the offense. However, this is not the issue presented in this appeal. Rather, the question is whether the prosecutor is barred from arguing that the jury should give little or no weight to mitigation evidence that lacks a nexus to the crime. We believe that the answer to this question is found in the U.S. Supreme Court's holding in *Eddings v. Oklahoma*, 455 U.S. 104 (1982). In *Eddings*, the Court held that the sentencer "may determine the weight to be given relevant mitigating evidence" even if the evidence may not properly be excluded. *Id*. at 114-15. Applying this holding, the Ninth Circuit has stated: "While it is true that a sentencer may not 'refuse to consider, *as a matter of law,* any relevant mitigating evidence,' a sentencer is free to assess how much weight to assign to such evidence. *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998) (quoting *Eddings*, 455 U.S. at 114). Likewise, when considering a death sentence imposed by a judge, that court stated: "Having *considered* all the evidence, the judge was not obliged to *find* it mitigating; he was 'free to assess how much weight to assign to such evidence.'" *Pizzuto v. Arave*, 280 F.3d 949, 972 (9th Cir. 2002) (quoting *Ortiz*, 149 F.3d at 943), *opinion amended and superseded in part*, 385 F.3d 1247 (9th Cir. 2004). In *State v. Anderson*, 111 P.3d 369 (Ariz. 2005), the defendant advanced a claim of error based upon the prosecution's cross-examination and closing arguments that focused on the absence of a nexus between certain mitigation evidence and the crime, including the argument that a defense psychologist "didn't testify about any links, any connections between the defendant's upbringing and him murdering people. Nothing in his childhood caused that." *Id*. at 392. The court rejected this claim, stating:

> None of these statements was improper. While *Eddings* and various other Supreme Court decisions dictate a liberal rule of *admissibility* for mitigating evidence, they still leave it to the sentencer to "determine the weight to be given to relevant mitigating evidence." *Eddings*, 455 U.S. at 114–15, 102 S.Ct. 869. Once the jury has heard all of the defendant's mitigation evidence, there is no constitutional prohibition against the State arguing that the evidence is not particularly relevant or that it is entitled to little weight. The prosecutor's various comments and questions here simply went to the weight of Anderson's mitigation evidence and were not improper.

24

*Id*. We agree with these decisions and find no prosecutorial misconduct in the prosecutor's closing argument that focused on the absence of connection between Dunlap's mental health issues and the crime for which he was being sentenced.

Dunlap next claims error based upon the prosecutor's statement in closing argument regarding the utter disregard aggravator "that there is some language in that instruction that talks about the cold-blooded pitiless slayer, and that is given to you *as an example of what utter disregard is*." Relying on *Arave v. Creech*, Dunlap argues that the emphasized language "impermissibly and unconstitutionally broadened the aggravator." In *Creech*, the Supreme Court held that the limiting construction of the aggravator adopted by this Court, i.e., "the phrase 'cold-blooded, pitiless slayer' refers to a killer who kills without feeling or sympathy" meets constitutional requirements. 507 U.S. at 471-72. Thus, any argument that the utter disregard instruction encompassed situations other than the "cold-blooded, pitiless slayer" would have been an erroneous statement of law. However, despite Dunlap's focus on the use of the word "example," viewing the relevant portion of the argument, we do not view the prosecutor's closing argument to have distorted the limiting construction governing this aggravator. The prosecutor argued:

> So we look at the first aggravating factor in this case as being utter disregard for human life, and clearly that is utter disregard for the life of Tonya Crane. And this instruction talks about acts or circumstances committed by the defendant that exhibit the highest and utmost callous disregard for human life. And what this instruction is referring to, it is referring to Tim Dunlap's lack of conscience regarding the killing of Tonya Crane.
> Now there is some language in that instruction that talks about the cold-blooded pitiless slayer, and that is given to you as an example of what utter disregard is. It talks about marked by absence of feeling, consideration, clemency, matter of fact, or emotionless. Says that pitiless means devoid of or unmoved by mercy or compassion. They are talking about a slayer who kills without feeling or sympathy.
> So, in looking at this particular crime, what facts exhibit the defendant's utter disregard for the life of Tonya Crane?

The prosecutor then asked the jury whether there was "really any better way to describe Tim Dunlap than a cold-blooded, pitiless slayer" and whether there was "really any other way, better way, to describe Tim Dunlap on that day than cold-blooded and pitiless." At no time did the prosecutor suggest that Dunlap's actions demonstrated an utter disregard for human life other than by acting as a cold-blooded and pitiless slayer. Thus, we find no prosecutorial misconduct in this regard.

25

Dunlap also claims prosecutorial misconduct based upon the following two statements: "And for his actions on that day, Idaho law requires that his life be taken as well," and "the main reason that Tim Dunlap deserves the death penalty in this case is because Idaho law requires it." We disagree, as these statements fit within the "considerable latitude" afforded the parties during closing arguments. We interpret both statements as expressing the State's position that the jury should impose the death sentence because the State had met its burden under the law and that upon weighing all the evidence, the jury should find that the mitigating evidence, weighed against each of the aggravating circumstances, was not sufficiently compelling to make imposition of the death penalty unjust. Thus, we find that Dunlap has failed to demonstrate error.

Finally, Dunlap asserts prosecutorial misconduct because "[t]he prosecutor told jurors to focus on 'free society' when deciding if Mr. Dunlap exhibited a propensity to commit murder that would probably constitute a continuing threat to society."[6] The decisions cited by Dunlap, *Kelly v. South Carolina* and *Simmons v. South Carolina*, do not support this claim of error. *Kelly* opened with a discussion of the pertinent legal principle:

> Last Term, we reiterated the holding of *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), that when "a capital defendant's future dangerousness is at issue, and the only sentencing alternative to death available to the jury is life imprisonment without possibility of parole, due process entitles the defendant 'to inform the jury of [his] parole ineligibility, either by a jury instruction or in arguments by counsel.'" *Shafer v. South Carolina*, 532 U.S. 36, 39, 121 S.Ct. 1263, 149 L.Ed.2d 178 (2001) (quoting *Ramdass v. Angelone*, 530 U.S. 156, 165, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000) (plurality opinion)).

*Kelly*, 534 U.S. at 248 (alteration in original). In this case, J.I. 14 explicitly instructed the jury that the defendant would be sentenced to life without the possibility of parole if the State failed to prove the existence of any statutory aggravating circumstance. If that were not sufficient to meet the requirements of *Simmons* and *Kelly*, the trial court further instructed the jury in J.I. 15 that such a sentence requires that the "person must spend the rest of his or her natural life in prison." Dunlap's attorney noted on at least five occasions in his closing argument that Dunlap would never be released from prison. In this case, there is simply no possibility that the prosecutor's argument led the jury to impose the death penalty as " 'an act of 'self-defense' "

---

[6] The use of quotation marks suggests a phrase used by the prosecutor. A careful review of the prosecutor's closing argument belies the suggestion.

that the rule from *Simmons* was intended to address. *Kelly*, 534 U.S. at 255. Thus, we find no error.

*g) Juror misconduct*

Dunlap contends that the district court's failure to investigate alleged juror misconduct violated his right to a fair trial. Dunlap argues that the court should have conducted an interview with a juror who was allegedly seen talking on a cellphone during deliberations. Instead, after an off-the-record discussion with the spectator who brought the alleged misconduct to the court's attention for which both parties' attorneys were present, the court went on the record and both the State and Dunlap's trial counsel waived questioning the juror. Dunlap contends that the court's failure to inquire into the misconduct was error because without interviewing the juror alleged to be involved the court could not determine whether prejudice resulted from the communication and the court thereby violated Dunlap's right to a fair trial.

Under the test for unobjected-to error announced in this opinion, Dunlap has the burden of demonstrating the existence of an error that contributed to the sentence that was imposed. In this case, Dunlap has not cited to any authority suggesting that the scope of the district court's investigation constituted error. He cites *Remmer v. United States*, 347 U.S. 227, 229-30 (1954), for the proposition that "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . ." However, in that case, defense counsel was not made aware of the inappropriate juror contact. *Id.* The U.S. Supreme Court ordered a remand for the lower court to "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Id.* at 230.

In a later case, the Supreme Court held that "due process does not require a new trial every time a juror has been placed in a potentially compromising situation," rather, it requires "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Further, those judicial "determinations may properly be made at a hearing like that ordered in *Remmer* and held in this case." *Id.* (footnote omitted). Thus, where the defendant has an opportunity to participate in the

process that the trial court uses to determine whether juror misconduct has occurred, any error may be corrected.

In this case, the court conducted an inquiry that included Dunlap's attorneys. Counsel was apparently satisfied, as they waived the opportunity to question the juror. While the question whether the attorney's response constituted ineffective assistance of counsel will be considered later, it cannot be said that this situation is the same as in *Remmer*. Therefore, we hold that Dunlap has not shown error.

*h) Application of the rules of evidence*

Dunlap argues that the district court violated his rights to due process and a fair trial by granting the State's motion to consider relevant and reliable evidence without subjecting that evidence to the Idaho Rules of Evidence. The State responds that there was no error because the rules are not applicable to sentencing proceedings.

We have held that "[t]he Idaho Rules of Evidence, except those relating to privileges, do not apply to sentencing hearings." *State v. Jeppesen*, 138 Idaho 71, 75, 57 P.3d 782, 786 (2002) (citation omitted); I.R.E. 101(e)(3)). Instead, the admission of evidence in capital sentencing proceedings is governed by Idaho Code § 19-2515(6), which provides that "the state and the defendant shall be entitled to present all relevant evidence in aggravation and mitigation." Thus, under both the plain language of the statute and this Court's prior decisions, the Idaho Rules of Evidence do not apply to capital sentencing proceedings.

Dunlap argues that in *Ring v. Arizona* the Supreme Court of the United States held that aggravators are to be treated like elements of a separate crime and that each element of each aggravator requires proof beyond a reasonable doubt. 536 U.S. 584, 609 (2002). Consequently, he contends the State's presentation of evidence in aggravation is not a sentencing proceeding, but rather, it is an effort to prove an element of the offense which is subject to the rules of evidence. This argument is not persuasive. Indeed, we rejected this argument in *Porter v. State*:

> *Ring* did not elevate those statutory aggravating circumstances into elements of a crime, nor did it create a new crime. *Schriro v. Summerlin*, [542 U.S. 348] (2004). Indeed, the United States Supreme Court lacks the authority to enact or amend state legislation. Only our state legislature has that authority, and it did not make the aggravating circumstances elements of the crime. *Ring* merely held that a state cannot impose the death penalty unless its sentencing procedures have the jury, not the judge, determine the existence of a statutory aggravator.

140 Idaho 780, 784, 102 P.3d 1099, 1103 (2004). Thus, we hold that Dunlap has not shown error.

*i) Submission of the utter disregard aggravator to the jury*

At Dunlap's 1992 sentencing, the judge found that the utter disregard aggravator had been proven beyond a reasonable doubt but declined to premise a death sentence on this aggravator because the Ninth Circuit had recently held that Idaho's utter disregard aggravator was unconstitutionally vague. *Creech v. Arave*, 947 F.2d 873, 882 (9th Cir. 1991) (en banc). On appeal, Dunlap challenged the aggravators the district court relied on to impose the death penalty, but the State did not cross-appeal the sentencing judge's failure to apply the utter disregard aggravator and this Court did not address it. *State v. Dunlap* (*Dunlap I*), 125 Idaho 530, 532, 873 P.2d 784, 786 (1993). Dunlap argues that because the district court's sentence of death was an appealable final judgment that the State could have challenged via cross-appeal at that time, the district court's submission of the utter disregard aggravator to the jury was barred by the law of the case doctrine. The State responds that the district court did not err by submitting the aggravator for the jury's consideration because there has been an intervening change in the law and, even if it was an error, it is harmless because the jury found that the State proved the existence of two other aggravating factors.

The law of the case doctrine provides "upon an appeal, the Supreme Court, in deciding a case presented[,] states in its opinion a principle or rule of law necessary to the decision, such pronouncement becomes the law of the case, and must be adhered to throughout its subsequent progress, both in the trial court and upon subsequent appeal. . . ." *Stuart v. State*, 136 Idaho 490, 495, 36 P.3d 1278, 1283 (2001) (quoting *Swanson v. Swanson*, 134 Idaho 512, 515, 5 P.3d 973, 976 (2000)). The underlying purpose for the doctrine is to "maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit . . . ." *Ingle v. Circuit City*, 408 F.3d 592, 594 (9th Cir. 2005) (quoting 18B Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* 2d § 4478, at 637–38 (2002)). Courts have recognized an exception to the doctrine based upon intervening changes in the law. *See, e.g.*, *Davis v. United States*, 417 U.S. 333, 342 (1974). We hold that the reversal of the Ninth Circuit's holding in *Creech* by *Arave v. Creech*, 507 U.S. 463, 478 (1993), represents an intervening change in the law such that the law of the case doctrine does not apply.

29

Relying on *Arizona v. Rumsey*, 467 U.S. 203 (1984), Dunlap also asserts that submission of the utter disregard aggravator to the jury violated his due process, fair trial[7] and double jeopardy rights. In *Rumsey*, the trial judge in a capital case returned a "special verdict" setting forth his findings that no aggravating or mitigating circumstances were present. *Id.* at 205. Rumsey appealed, and on appeal, the Arizona Supreme Court found that the trial court had misinterpreted one of the statutory aggravators. Based upon that determination, the court vacated the sentence and remanded the case for resentencing. *Id.* at 207. Upon remand, the trial court found a statutory aggravator that was not outweighed by the mitigating evidence and sentenced Rumsey to death. *Id.* at 208. On appeal, the Arizona Supreme Court, relying on *Bullington v. Missouri*, 451 U.S. 430 (1981), concluded that Rumsey's sentence violated the constitutional prohibition against double jeopardy. *Id.* The U.S. Supreme Court affirmed, holding

> The double jeopardy principle relevant to respondent's case is the same as that invoked in *Bullington*: an acquittal on the merits by the sole decisionmaker in the proceeding is final and bars retrial on the same charge. Application of the *Bullington* principle renders respondent's death sentence a violation of the Double Jeopardy Clause because respondent's initial sentence of life imprisonment was undoubtedly an acquittal on the merits of the central issue in the proceeding— whether death was the appropriate punishment for respondent's offense. The trial court entered findings denying the existence of each of the seven statutory aggravating circumstances, and as required by state law, the court then entered judgment in respondent's favor on the issue of death. That judgment, based on findings sufficient to establish legal entitlement to the life sentence, amounts to an acquittal on the merits and, as such, bars any retrial of the appropriateness of the death penalty.

*Rumsey*, 467 U.S. at 211. The Supreme Court later explained that an "acquittal" necessary to trigger Double Jeopardy protections is "based on findings sufficient to establish legal entitlement to the life sentence–*i.e.,* findings that the government failed to prove one or more aggravating circumstances beyond a reasonable doubt." *Sattazahn v. Pennsylvania*, 537 U.S. 101, 108 (2003). Six years later, Justice Ginsburg reiterated on behalf of a unanimous court that an acquittal requires " 'findings sufficient to establish legal entitlement to the life sentence.' " *Bobby v. Bies*, 556 U.S. 825, 833 (2009) (quoting *Sattazahn*, 537 U.S. at 109). The Court returned to this subject earlier this year in *Evans v. Michigan*, ___ U.S. ___, 133 S. Ct. 1069 (2013), stating "our cases have defined an acquittal to encompass any ruling that the

---

[7] We are unable discern the factual or legal basis for Dunlap's assertion that he was denied a fair trial on this aggravator.

prosecution's proof is insufficient to establish criminal liability for an offense." *Id.* at 1074-75 (citing *U.S. v. Scott*, 437 U.S. 82, 98 (1978); *Burks v. U.S.*, 437 U.S. 1, 10 (1978); *U.S. v. Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977)). The Court further explained that "an 'acquittal' includes 'a ruling by the court that the evidence is insufficient to convict,' a 'factual finding [that] necessarily establish[es] the criminal defendant's lack of criminal culpability,' and any other 'rulin[g] which relate[s] to the ultimate question of guilt or innocence.'" *Id.* at 1075 (quoting *Scott*, 437 U.S. at 91, 98, and 98 n.11) (bracketed material inserted and internal quotation marks omitted in original). The Court then explained that acquittals are "substantive rulings stand[ing] apart from procedural rulings that may also terminate a case midtrial. . . . Procedural dismissals include rulings on questions that 'are unrelated to factual guilt or innocence. . . .'" *Id. (quoting Scott*, 437 U.S. at 98 n.11, 99).

In the present case, the 1992 sentencing court did not acquit Dunlap of the utter disregard aggravator. To the contrary, it found that the aggravator had been proven beyond a reasonable doubt but could not be applied due to the Ninth Circuit's ruling–a decision that manifestly did not turn on Dunlap's factual guilt or innocence. The Double Jeopardy Clause of the Fifth Amendment does not assist Dunlap. For these reasons, we hold that the district court did not err by submitting the utter disregard aggravator to the jury.

*j) Constitutionality of the utter disregard aggravator*

Dunlap contends that the jury sentencing requirement of *Ring v. Arizona*, 536 U.S. 584 (2002), renders Idaho's utter disregard aggravator unconstitutionally vague. The State replies that *Ring* has no effect upon the constitutionality of the aggravator because the U.S. Supreme Court found that the statutory aggravator passed constitutional muster because of our limiting construction, not because judges were the finder of fact.

Constitutional questions are reviewed de novo. *State v. Draper*, 151 Idaho 576, 598, 261 P.3d 853, 875 (2011) (citing *Stuart v. State*, 149 Idaho 35, 40, 232 P.3d 813, 818 (2010)). When a party challenges a statute on constitutional grounds, it "bears the burden of establishing that the statute is unconstitutional and must overcome a strong presumption of validity." *State v. Manzanares*, 152 Idaho 410, 418, 272 P.3d 382, 390 (2012) (quoting *State v. Korsen*, 138 Idaho 706, 711, 69 P.3d 126, 131 (2003)). Further, when considering these challenges, "[a]ppellate courts are obligated to seek an interpretation of a statute that upholds its constitutionality." *Id.*

31

In *State v. Osborn*, this Court construed "utter disregard for human life" to "be reflective of acts or circumstances surrounding the crime which exhibit the highest, the utmost, callous disregard for human life, i.e., the cold-blooded, pitiless slayer." 102 Idaho 405, 419, 631 P.2d 187, 201 (1981). The Supreme Court of the United States then held that because this construction "defines a state of mind that is ascertainable from surrounding facts," the aggravator was not unconstitutional. *Creech*, 507 U.S. at 471-74. This determination relied, at least partly, on the "ordinary usage" of the words "cold-blooded, pitiless slayer." *Id.* at 472. In *Creech*, the Court used both "sentencer" and "sentencing judge" when referring to the entity that would apply the aggravator to determine a sentence. *Id.* at 474-76.

Dunlap contends that the *Creech* Court found the *Osborn* construction sufficient only in the context of judge sentencing. This Court has taken note of the differences between judge and jury sentencing regimes, holding that "the potential for inconsistent application [of aggravating circumstance statutes] that exists as a result of jury sentencing is eliminated where the judge sentences." *State v. Lankford*, 116 Idaho 860, 877, 781 P.2d 197, 214 (1989). However that holding was based upon our determination that the language of the "especially heinous, atrocious, or cruel" aggravator employed "a term of art" that is "commonly understood among the members of the judiciary." *Id.* As noted, the determination in *Creech* was based upon the U.S. Supreme Court's consideration of the "ordinary meaning" of the limiting construction that this Court had applied to the statutory language. *Creech*, 507 U.S. at 472. J.I. 10 accurately instructed the jury as to this limiting construction. We hold that the utter disregard aggravator is not rendered unconstitutional by the change from judge to jury sentencing.

### k) Admission of mental health evidence

Dunlap contends that the district court's admission of reports written by two mental health experts (Dr. Doten and Dr. Brooks) violated Dunlap's Confrontation Clause rights. The State responds that there was no constitutional violation because the Confrontation Clause does not apply at sentencing proceedings.

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. However, this Court has held that this protection "does not require that a capital defendant be afforded the opportunity to confront and cross-examine live witnesses in his sentencing proceedings." *Sivak v. State*, 112 Idaho 197, 216, 731 P.2d 192, 211 (1986). The *Sivak* Court

explained that this holding was "based, in part, on the belief that modern penological policies, which favor sentencing based on the maximum amount of information about the defendant, would be thwarted by restrictive procedural and evidentiary rules." *Id.* at 215, 731 P.2d at 210 (citing *Williams v. New York*, 337 U.S. 241, 246-50 (1949)).

Dunlap notes that the U.S. Supreme Court has recently addressed the scope of the Confrontation Clause, holding that this protection "bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination.' " *Davis v. Washington*, 547 U.S. 813, 821 (2006) (quoting *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004)). In both *Crawford* and *Davis*, the Court stated that the Confrontation Clause applies to "prosecutions" and statements made for prosecutorial use. *Crawford*, 541 U.S. at 42, 51; *Davis*, 547 U.S. at 822. This, of course, begs the question whether the sentencing phase in a capital case is a "prosecution." Since *Davis* was released, the U.S. Supreme Court has reaffirmed the principle that all the information available to a sentencer should be considered. *See Pepper v. United States*, ___ U.S. ___, 131 S. Ct. 1229, 1240 (2011) ("[H]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."(second alteration in original)) (quoting *Williams*, 337 U.S. at 246-47).

We have carefully examined case law from our sister states and the federal courts on this important issue. In our view, the most persuasive analysis of the applicability of the Confrontation Clause in capital sentencing proceedings is to be found in *United States v. Fields*, 483 F.3d 313 (5th Cir. 2007). After a lengthy and scholarly consideration of precedent from the U.S. Supreme Court, *see id.* at 324-337, that court concluded that "the Confrontation Clause is inapplicable to the presentation of testimony relevant only to the sentencing authority's selection decision." *Id.* at 337. We agree and hold that the admission of the reports did not violate Dunlap's Sixth Amendment rights.

Relying on our decisions in *Estrada v. State*, 143 Idaho 558, 149 P.3d 833 (2006), and *State v. Wood*, 132 Idaho 88, 976 P.2d 702 (1998), Dunlap also asserts that admission of evidence of Dr. Brooks' report and portions of Dr. Estess' 1992 report violated his Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to counsel. Evidence regarding Dr. Brooks' report came before the jury in the course of testimony by Dr. Matthews on behalf of the State. Dr. Matthews testified that he was most interested by Dr.

33

Brooks' finding that Dunlap "does not present a history of hallucinations or delusions." Following Dr. Matthews' testimony, Dr. Brooks' report was offered into evidence by the State and admitted without objection. Dunlap also presented excerpts of the report by way of Dr. Pettis' affidavit, in which he quoted Dr. Brooks' report: "[Dunlap] is very easily overwhelmed by emotional aspects of his environment and may well react explosively and violently in such circumstances. I do not find significant evidence of a formal thought disorder. There are no consistent, significant indications of psychotic process. I do not find unusual perceptual disturbances."

The State did not introduce evidence of Dr. Estess' 1992 report. Rather, Dunlap admitted an excerpt of that report in Dr. Pettis' affidavit. Of significance to this appeal, that excerpt included the following: "[Dunlap] does not manifest any evidence of hallucinations, illusions or delusions that I could tell. That is, he does not manifest anything that I think would reflect active psychotic process." Dr. Pettis then quoted Dr. Estess' conclusion that he did not believe that Dunlap had "any evidence of significant psychiatric difficulty."

We accept Dunlap's contention that introduction of these reports was error. However, Dunlap's introduction of the excerpt of Dr. Estess' report was invited error. *State v. Gleason*, 123 Idaho 62, 66, 844 P.2d 691, 695 (1992) ("Appellant cannot now be heard to denounce testimony that he roused. This constitutes invited error.") (quoting *State v. Owsley*, 105 Idaho 836, 837-38, 673 P.2d 436, 437-38 (1983)).

The introduction of Dr. Brooks' report presents a far cloudier picture of invited error. As we noted in *Owsley*:

> It has long been the law in Idaho that one may not successfully complain of errors one has acquiesced in or invited. *Walling v. Walling*, 36 Idaho 710, 214 P. 218 (1923). Errors consented to, acquiesced in, or invited are not reversible. *Frank v. Frank*, 47 Idaho 217, 273 P. 943 (1929).

105 Idaho at 838, 673 P.2d at 438. Dunlap's introduction of a portion of Dr. Brooks' report by way of Dr. Pettis' affidavit has led this Court to carefully scrutinize that report. Although the portions of Dr. Brooks' report quoted above are damaging, there are certainly aspects that are mitigating, or at the very minimum, likely to evoke some measure of jury sympathy. Dr. Brooks notes that Dunlap married at age 21. Dunlap's marriage was troubled, with Dunlap suggesting that his 16-year-old wife was unfaithful. More significantly, he was concerned that she was abusing and neglecting their child, but child protective services were not responsive to his

reported concerns. It was during this difficult time that Dunlap was first hospitalized. Dr. Brooks reported that Dunlap had been twice hospitalized and that he had consulted a child psychologist during his childhood. Dunlap explained the circumstances of his crime, stating that he could "see what he was doing and what was going on" but was unable to control his action. He expressed remorse for the killing. Dr. Brooks also reported that Dunlap had a full scale IQ of only 80, placing him in the Dull Normal range of cognitive functioning. Dr. Brooks correlated Dunlap's low IQ with "increased impulsiveness in societal situations and a lack [of] moral sensitivity and judgment." Dr. Brooks indicated that testing showed that Dunlap "has particular difficulty with planning sequential events, evaluative thinking and comprehending cause and effect relationships" and that the testing "very clearly points to the possibility of a frontal dysfunction in cerebral functioning." In closing argument, Dunlap's attorney focused the jury's attention on the evidence of Dunlap's low intelligence and the psychological difficulties that he experienced as a child. After careful consideration, we conclude that Dunlap's attorney wanted Dr. Brooks' report before the jury and that its admission was invited error. Whether this conclusion is correct (and if so, whether counsel's decision constituted ineffective assistance of counsel) is a subject that this Court will return to when discussing the summary dismissal of Dunlap's petition for post-conviction relief.

### l) Constitutionality of capital punishment for mentally ill defendants

The Eighth Amendment prohibits the imposition of cruel and unusual punishment, which is defined by "evolving standards of decency that mark the progress of a maturing society." *Atkins v. Virginia*, 536 U.S. 304, 311-12 (2002). Applying the Eighth Amendment, the U.S. Supreme Court has determined that defendants who are mentally retarded or insane may not be sentenced to death. *Atkins*, 536 U.S. at 321; *Ford v. Wainwright*, 477 U.S. 399, 409-10 (1986). Albeit in a much different context, the U.S. Supreme Court has recognized that the differences between the mentally retarded and the mentally ill permit states to treat them differently. *See Heller v. Doe*, 509 U.S. 312, 321-22 (1993). Dunlap candidly acknowledges that the Supreme Court has not addressed the constitutionality of death penalty schemes that permit the execution of mentally ill defendants. However, Dunlap contends that the rationale underlying *Atkins* and *Ford* compels the same conclusion for mentally ill defendants.

It appears that every court that has considered this issue have refused to extend *Atkins* and hold that the Eighth Amendment categorically prohibits execution of the mentally ill.

*Dunlap v. Commonwealth*, 2010-SC-000226-MR, 2013 WL 3121689, at \*65 (Ky. June 20, 2013) ("We are not prepared to hold that mentally ill persons are categorically ineligible for the death penalty. . . . A categorical bar, applying equally to persons suffering from paranoid schizophrenia and bulimia, would be unwise."); *Malone v. State*, 293 P.3d 198, 216 (Okla. Crim. App. 2013) ("Appellant cites no cases from any American jurisdiction that hold that the *Atkins* rule or rationale applies to the mentally ill. . . . We expressly reject that the *Atkins* rule or rationale applies to the mentally ill."); *Simmons v. State*, 105 So. 3d 475, 511 (Fla. 2012) (reiterating rejection of claim "that defendants with mental illness must be treated similarly to those with mental retardation because both conditions result in reduced culpability."); *People v. Castaneda*, 254 P.3d 249, 290 (Cal. 2011) (holding that antisocial personality disorder is not analogous to mental retardation or juvenile status for purposes of imposition of the death penalty); *Mays v. State*, 318 S.W.3d 368, 379 (Tex. Crim. App. 2010) (noting absence of authority to support claim that mental illness renders one exempt from execution under the Eighth Amendment); *Lewis v. State*, 620 S.E.2d 778, 786 (Ga. 2005) (noting defendant failed to "cite any authority that establishes a constitutional prohibition on convicting and sentencing to death a defendant who is competent but mentally ill" and declining to extend the holding of *Atkins*); *State v. Johnson*, 207 S.W.3d 24, 51 (Mo. 2006) (noting that "federal and state courts have refused to extend *Atkins* to mental illness situations"); *State v. Hancock*, 840 N.E.2d 1032, 1059-60 (Ohio 2006) (refusing appellant's request "to establish a new, ill-defined category of murderers who would receive a blanket exemption from capital punishment without regard to the individualized balance between aggravation and mitigation in a specific case"); *Franklin v. Bradshaw*, 695 F.3d 439, 455 (6th Cir. 2012) (noting absence of case law extending *Atkins* to prohibit the execution of those with mental illnesses); *In re Neville*, 440 F.3d 220, 221 (5th Cir. 2006) (rejecting claim that *Atkins* and *Roper v. Simmons,* 543 U.S. 551 (2005), created a new rule making the execution of mentally ill persons unconstitutional). We join these courts in holding that a defendant's mental illness does not prevent imposition of a capital sentence.

**2. Issues properly preserved below.**

As noted above, under the standard of review we announced in *Perry*, this Court reviews issues that have been raised before the trial court for harmless error. This requires the defendant to demonstrate that there was an error and, upon that showing, the burden shifts to the State to

demonstrate "to the appellate court beyond a reasonable doubt that the . . . violation did not contribute to the jury's verdict." 150 Idaho 209, 227, 245 P.3d 961, 979 (2010).

*a) Denial of Dunlap's motion to exclude jurors for cause*

Dunlap contends that the district court abused its discretion by denying Dunlap's motions to strike two potential jurors for cause. "The decision to excuse potential jurors is within the discretion of the trial court." *State v. Hairston*, 133 Idaho 496, 506, 988 P.2d 1170, 1180 (1999) (citing *State v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989)). The trial court is not required to empanel a juror that is entirely unfamiliar with the facts and issues involved in the case; rather, the court is looking for a juror who "can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* (quoting *Murphy v. Florida*, 421 U.S. 794, 800 (1975)). In determining whether a juror can, in fact, lay aside previous opinions and impressions, the district court "is entitled to rely on assurances from [the potential juror] concerning partiality or bias," although those assurances are "not always dispositive." *Id.* (citing *State v. Jones*, 125 Idaho 477, 484, 873 P.2d 122, 129 (1994)).

In this case, Dunlap contends that the statements of two potential jurors demonstrated their bias. The first potential juror, Mansfield, stated that if the State could prove its case in aggravation, a death sentence should be automatic and that, if a defendant willfully pulls the trigger, "that is probably the death penalty." However, Mansfield also stated that he would consider "extenuating circumstances," including psychological factors. The district court found these assurances, along with Mansfield's statement that he would be fair, sufficient to deny the challenge for cause. The second potential juror, Mickelson, admitted that he knew some of the State's witnesses and that he might tend to give "a little more credence to" statements from people he knew. He also stated that it might be "difficult" not to impose the death penalty. The district court also denied this challenge for cause after receiving assurances from Mickelson that he had not already decided to impose death, and that he could set aside his friendships with witnesses and make his decision based upon the evidence.

We hold that the district court did not abuse its discretion. The court recognized its discretion and conducted appropriate inquiries, asking both jurors questions to explore their potential bias. After considering their answers, the court determined that their assurances were sufficient to support a denial of Dunlap's for-cause challenge. We find that Dunlap has failed to demonstrate error.

37

*b) Denial of Dunlap's request for appointment of an additional mental health expert*

Dunlap argues that the district court erred by denying his motion to appoint a second mental health expert to provide live testimony in lieu of having that expert's prior testimony read to the jury. In *Ake v. Oklahoma*, the Supreme Court of the United States held that "when a defendant demonstrates . . . that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense."[8] 470 U.S. 68, 83 (1985). The *Ake* Court explained that this obligation is not burdensome because it is limited to "provision of one competent psychiatrist." *Id.* at 78-79. In *State v. Lovelace*, 140 Idaho 53, 90 P.3d 278 (2003), this Court discussed the legal standards governing requests for funding the defense of an indigent person:

> The constitution does not require a state to provide expert or investigative assistance merely because a defendant requests it. *State v. Olin*, 103 Idaho 391, 648 P.2d 203 (1982), *citing United States ex rel. Smith v. Baldi*, 344 U.S. 561, 568, 73 S.Ct. 391, 395, 97 L.Ed. 549, 556 (1953). A defendant's request for expert or investigative services should be reviewed in light of all circumstances and be measured against the standard of "fundamental fairness" embodied in the due process clause. *Id., citing Watson v. Patterson*, 358 F.2d 297, 298 (10th Cir.1966). Before authorizing the expenditure of public funds for a particular purpose in an indigent's defense, the trial court must determine whether the funds are necessary in the interest of justice. *State v. Powers*, 96 Idaho 833, 838, 537 P.2d 1369, 1374 (1975), *cert. denied,* 423 U.S. 1089, 96 S.Ct. 881, 47 L.Ed.2d 99 (1976). Such a review necessarily involves the exercise of the sound discretion of the trial court, and a denial of a request for investigative assistance will not be disturbed absent a showing that the trial court abused its discretion by rendering a decision which is clearly erroneous and unsupported by the circumstances of the case. *State v. Olin, supra.*

*Id.* at 65, 90 P.3d at 290.

Here, the district court had previously granted Dunlap's request to appoint one expert, Dr. Beaver. This meets the minimum requirements outlined in *Ake*. The court also indicated that it would consider allowing a second expert to be hired. While the court eventually denied Dunlap's request for the second mental health expert, it did agree to permit prior testimony given by that

---

[8] However, the *Ake* Court also noted that this right is not "a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own." 470 U.S. at 83. The right exists to ensure that an indigent defendant "will have access to a competent psychiatrist," and it is the State's responsibility to determine how to implement this right. *Id.*

second expert, Dr. Cunningham, to be read to the jury. We hold that Dunlap has not demonstrated that the district court erred.

### c) The district court's concern for county finances

Dunlap claims that his rights to due process and a fair trial were violated by the district court's role in managing Caribou County's budget in connection with the sentencing proceedings. We considered a similar claim in *State v. Wood*, 132 Idaho 88, 967 P.2d 702 (1998). There, we held that there was no constitutional infirmity in having the trial judge in a capital case rule on requests for funding investigations and hiring experts. *Id.* at 100, 967 P.2d at 714. Rather, we held that the grant or denial of assistance is committed to the discretion of the trial court. *Id.*

To the extent that Dunlap is advancing a generalized complaint that he received inadequate funding, which would necessarily implicate an abuse of discretion, we are not convinced. Due process "guarantees every defendant the right to a trial comporting with basic tenets of fundamental fairness." *State v. Thorngren*, 149 Idaho 729, 735, 240 P.3d 575, 581 (2010) (quoting *State v. Pearce*, 146 Idaho 241, 248, 192 P.3d 1065, 1072 (2008)). However, "[e]rror in the abstract does not necessarily rise to the level of constitutional dimensions unless and until a defendant properly presents specific prejudice resulting from such error." *State v. Wright*, 97 Idaho 229, 231, 542 P.2d 63, 65 (1975), *distinguished on other grounds by State v. Walters*, 120 Idaho 46, 813 P.2d 857 (1990). This Court does not consider errors that do not affect substantial rights. *Thorngren*, 149 Idaho at 735, 240 P.3d at 581. Thus, to prove that the district court's conduct deprived Dunlap of his constitutional rights, he must show specifically how that conduct prejudiced him. In this case, Dunlap has generally alleged that the district court's "preoccupation" with its financial responsibility to Caribou County led to "erroneous denial of funding," which in turn resulted in a due process violation. We hold that Dunlap has not demonstrated the existence of an error.

### d) Cumulative Error

Dunlap also argues that even if this Court holds that no individual error entitles Dunlap to a new sentencing, the accumulation of the harmless sentencing errors violates his rights to due process and a fair trial. We have previously held that where there is an "'accumulation of irregularities, each of which by itself might be harmless, but when aggregated, the errors show the absence of a fair trial,' the cumulative error doctrine requires a reversal of the conviction as

the trial has contravened the defendant's right to due process." *State v. Payne*, 146 Idaho 548, 568, 199 P.3d 123, 143 (2008) (quoting *State v. Field*, 144 Idaho 559, 572–73, 165 P.3d 273, 286–87 (2007)). We have considered the cumulative impact of the errors that we have previously identified, i.e., J.I. 1, the lack of an instruction requiring independent evidence to support each of the aggravators, the prosecutor's comments regarding the burden of proof in voir dire, and Dr. Matthews' testimony as to the weight to be given Dr. Brooks' report. We conclude that these errors, in combination, did not deprive Dunlap of his due process rights to a fair trial in the jury sentencing proceedings.

## C. Appeal from the summary denial of post-conviction relief.

Dunlap advances sixteen allegations of error in the district court's summary dismissal of his application for post-conviction relief. Because eleven of the alleged errors are claims that Dunlap was denied effective assistance of counsel, those claims will be treated in one section and the remainder of the claims will be considered separately.

Our standard for reviewing a summary dismissal of an application for post-conviction relief is as follows:

> Summary dismissal of an application is the procedural equivalent of summary judgment under I.R.C.P. 56. Summary dismissal is permissible only when the applicant's evidence has raised no genuine issue of material fact that, if resolved in the applicant's favor, would entitle the applicant to the relief requested. If such a factual issue is presented, an evidentiary hearing must be conducted. However, summary dismissal may be appropriate even where the State does not controvert the applicant's evidence because the court is not required to accept either the applicant's mere conclusory allegations, unsupported by admissible evidence, or the applicant's conclusions of law.

*Payne*, 146 Idaho at 561, 199 P.3d at 136 (citations omitted). " 'The standard to be applied to a trial court's determination that no material issue of fact exists is the same type of determination as in a summary judgment proceeding.' " *Charboneau v. State*, 140 Idaho 789, 793, 102 P.3d 1108, 1112 (2004) (quoting *Saykhamchone v. State*, 127 Idaho 319, 321, 900 P.2d 795, 797 (1995)). Thus, we view the facts in the light most favorable to the applicant and "must determine whether a genuine issue of fact exists based on the pleadings, depositions and admissions together with any affidavits on file." *Ridgley v. State*, 148 Idaho 671, 675, 227 P.3d 925, 929 (2010) (citations and internal quotations omitted).

**1. Ineffective assistance of counsel.**

This Court has "adopted the *Strickland* two-prong test to evaluate whether a criminal defendant received effective assistance of counsel." *Dunlap III*, 141 Idaho 50, 59, 106 P.3d 376, 385 (2004) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Mathews*, 133 Idaho 300, 306, 986 P.2d 323, 329 (1999)). In order to survive a motion for summary dismissal, post-conviction relief claims based upon ineffective assistance of counsel must establish "the existence of material issues of fact as to whether: (1) counsel's performance was deficient, and (2) that deficiency prejudiced appellant's case." *Kelly v. State*, 149 Idaho 517, 522, 236 P.3d 1277, 1282 (2010) (citing *Saykhamchone*, 127 Idaho at 323, 900 P.2d at 799). To prove deficient performance, the appellant "must show the attorney's representation fell below an objective standard of reasonableness." *Dunlap III*, 141 Idaho at 59, 106 P.3d at 385 (citing *Gilpin–Grubb v. State*, 138 Idaho 76, 81, 57 P.3d 787, 792 (2002)). To demonstrate prejudice, the appellant "must show a reasonable probability that, but for the attorney's deficient performance, the outcome of the trial would have been different." *Id.* " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1403 (2011) (quoting *Strickland*, 466 U.S. at 694). This "requires a 'substantial, not just 'conceivable,' likelihood of a different result." *Id.* (quoting *Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 791 (2011)).

The appellant must also overcome "a strong presumption that trial counsel was competent and that trial tactics were based on sound legal strategy." *Dunlap III*, 141 Idaho at 58-59, 106 P.3d at 384-85 (citing *Strickland*, 466 U.S. at 689; *Mathews,* 133 Idaho at 306, 986 P.2d at 329). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Thus, strategic decisions are "virtually unchallengeable" if made after a "thorough investigation of the law and facts relevant to plausible options . . . ." *Id.* at 690-91. Decisions "made after less than complete investigation" are still reasonable to the extent "that reasonable professional judgments support the limitations on investigation." *Id.* Counsel is permitted to develop a strategy "that was reasonable at the time" and may "balance limited resources in accord with effective trial tactics and strategies." *Richter*, ___ U.S. ___, 131 S.Ct. at 789.

*a) Failure to object*

Dunlap argues that he was denied effective assistance of counsel by his attorneys' failure to object to: the district court's five-minute limit on individual voir dire, the admission of the reports of Dr. Brooks and Dr. Doten as violating Dunlap's confrontation rights, the admission of Dr. Brooks' report and the excerpt of Dr. Estess' 1992 report as violating Dunlap's Fifth Amendment rights, and the district court's security decisions, including the use of shackles during the sentencing proceedings.

First, with regard to the voir dire decision, we hold that Dunlap has not shown that counsel's performance was deficient. Rather, he has presented a conclusory allegation that they should have objected to ensure a fair and impartial jury. In Part IV(B)(1)(a), *supra*, we concluded that Dunlap has not shown that the district court erred by imposing the time limit on individual voir dire. We find that the district court did not err by summarily dismissing this claim.

We cannot find that there is a genuine issue of material fact as to whether Dunlap's attorneys were deficient in their performance by failing to object to the admission of Dr. Brooks' and Dr. Doten's reports on the ground that they violated his right to confront his accuser. As explained above, the Confrontation Clause does not apply in sentencing proceedings. Thus, counsel's failure to object did not constitute deficient performance and the district court did not err by summarily dismissing this claim of ineffective assistance of counsel.

As to the introduction of Dr. Brooks' report and the excerpt of Dr. Estess' 1992 report, we earlier concluded that this was invited error in Part IV(B)(1)(k). "When evaluating an ineffective assistance of counsel claim, this Court does not second-guess strategic and tactical decisions, and such decisions cannot serve as a basis for post-conviction relief unless the decision is shown to have resulted from inadequate preparation, ignorance of the relevant law, or other shortcomings capable of objective review. *State v. Shackelford*, 150 Idaho 355, 382-83, 247 P.3d 582, 609-10 (2010) (citing *Pratt v. State*, 134 Idaho 581, 584, 6 P.3d 831, 834 (2000)). In the absence of evidence suggesting that the introduction of Dr. Brooks' report and the excerpt of Dr. Estess' 1992 report was the product of inadequate preparation or ignorance of the relevant law, we hold that the district court did not err by summarily dismissing this claim of ineffective assistance of counsel.

We turn to Dunlap's claim of ineffective assistance of counsel based upon his attorneys' failure to object to his being shackled during the course of the sentencing proceedings. In *Deck v. Missouri*, 544 U.S. 622 (2005), the Supreme Court considered whether shackling a defendant

42

during the penalty phase of a capital case violated the Constitution and held "that the Constitution forbids the use of visible shackles during the penalty phase, as it forbids their use during the guilt phase, *unless* that use is 'justified by an essential state interest'—such as the interest in courtroom security—specific to the defendant on trial." *Id*. at 624 (quoting *Holbrook v. Flynn*, 475 U.S. 560, 568–569 (1986). Dunlap submitted admissible evidence showing that jurors were aware of his restraints. Based upon this showing, we are satisfied that there is a genuine issue of material fact as to whether trial counsel was deficient for failing to object to the shackles. "Where the alleged deficiency is counsel's failure to file a motion, a conclusion that the motion, if pursued, would not have been granted by the trial court, is generally determinative of both prongs of the [*Strickland* ] test." *State v. Payne*, 146 Idaho 548, 562, 199 P.3d 123, 137 (2008) (quoting *Sanchez v. State*, 127 Idaho 709, 713, 905 P.2d 642, 646 (Ct. App. 1995)). Thus, the critical inquiry is whether the motion, if filed, should have been granted or whether the legitimate interest in courtroom security justified Dunlap's restraints. The district court noted that Dunlap had pleaded guilty to first degree murder in this case and had been sentenced to death in Ohio. Under these circumstances, there is no reasonable possibility that an objection to Dunlap being shackled would have been successful. We therefore affirm the district court's grant of summary dismissal of this claim.

Dunlap also contends that trial counsel were ineffective because of their failure to object to the presence of law enforcement during the trial. He points to evidence that there were three officers present in the courtroom and that metal detectors were used. Dunlap quotes the U.S. Supreme Court's recognition of "the threat that a roomful of uniformed and armed policemen might pose to a defendant's chances of receiving a fair trial." *Holbrook v. Flynn*, 475 U.S. 560, 570-71 (1986). Dunlap fails to note the following two sentences that set forth the Court's holding: "But we simply cannot find an unacceptable risk of prejudice in the spectacle of four such officers quietly sitting in the first row of a courtroom's spectator section. Even had the jurors been aware that the deployment of troopers was not common practice in Rhode Island, we cannot believe that the use of the four troopers tended to brand respondent in their eyes 'with an unmistakable mark of guilt.' " *Id*. at 571 (footnote omitted) (quoting *Estelle v. Williams*, 425 U.S. 501, 518 (1976) (Brennan, J., dissenting)). We conclude that the district court properly dismissed this claim of ineffective assistance of counsel.

*b) Prior death sentence*

Dunlap argues that he was denied effective assistance of counsel by his attorneys' failure to redact testimony transcripts referring to Dunlap's prior death sentence and failure to investigate whether any other jurors were aware of the prior sentence. We hold that Dunlap has not demonstrated deficiency. As we explained above in Part IV(B)(1)(c), the authority cited by Dunlap does not support his contention that the jury's knowledge of his prior conviction would reduce the jury's sense of responsibility. Thus, counsel was not deficient in permitting the jury to learn of the prior sentence. We therefore affirm the district court's summary denial of this claim.

*c) Juror misconduct*

Dunlap contends that he was denied effective assistance of counsel by his attorneys' failure to request an investigation into allegations of juror misconduct and by their decision not to question the relevant juror. As noted above, after the jury retired to deliberate, there were allegations that a juror engaged in a telephone conversation regarding the case. We hold that counsels' conduct was not deficient. Dunlap has not alleged any facts regarding his attorneys' performance, only conclusory allegations that the district court's handling of the decision was an error and thus his attorneys should have objected. He asserts, without supporting evidence, that if the juror was talking on the phone, prejudice is established. Further, the conduct of Dunlap's attorneys falls under the category of unchallengeable strategic decisions. Counsel reviewed the note and explained that the decision was tactical, based upon the belief that he "felt it cut in our favor and I did not want to do anything to upset or, you know, cause any concern to the prospective juror. . . . I am sure it's something that we discussed as a defense team whether or not we wanted to follow up with that or not. And apparently the consensus was not." This reasoning was confirmed by co-counsel, who explained "it seems like the note was in our favor. That the witness may have been cynical of something that the state was saying." We affirm the district court's summary dismissal of this claim.

Dunlap also asserts that the district court erred by summarily dismissing his claim that the jury was exposed to extraneous evidence because they "may have consulted a dictionary during deliberations." He relies upon an unsigned affidavit prepared for one of the jurors and the affidavit of his investigator in support of this claim. "The application [for post-conviction relief] must present or be accompanied by admissible evidence supporting its allegations, or the application will be subject to dismissal." *State v. Shackelford*, 150 Idaho 355, 380, 247 P.3d 582, 607 (2010) (quoting *State v. Payne*, 146 Idaho 548, 561, 199 P.3d 123, 136 (2008)). The

unsigned affidavit is clearly inadmissible and the juror statements reported by the investigator are manifestly hearsay. The district court did not err in summarily dismissing this claim.

### d) Venue challenge

Dunlap argues that he was denied effective assistance of counsel by his attorneys' failure to adequately challenge venue. Counsel moved for a change of venue, which the district court denied. However, the court indicated that it would entertain another motion if the jury selection process made it clear that it would not be possible to select an impartial jury. Counsel did not renew the motion after receiving the completed jury questionnaires, which Dunlap contends reflected community bias against Dunlap. Dunlap maintains that counsel should have renewed the motion for change of venue and submitted examples of the media coverage and affidavits of community members that demonstrated bias against Dunlap. If true, these allegations might suggest deficient performance. However, regardless of the perceived bias in the community, Dunlap presented no evidence suggesting that the jury itself was biased. Dunlap's sentencing counsel even stated that after reviewing the questionnaires and conducting voir dire, he "thought we were working with, you know, a fairly open-minded bunch." Demonstrating prejudice in this case requires a showing that, absent the deficiency, the result would have been different. If there is no evidence that Dunlap's jury was biased, it is not "reasonably likely" that a different result would have occurred if the motion had been renewed. We therefore hold that Dunlap has not demonstrated a genuine issue of material fact regarding prejudice and affirm the district court's summary denial of this claim.

### e) Presentation of evidence

Dunlap contends that he was denied effective assistance of counsel by his attorneys' decision to rely on depositions and prior witness testimony in closing arguments, rather than live witness testimony. We hold that counsels' decisions in this claim are strategic matters. *See Giles v. State*, 125 Idaho 921, 924, 877 P.2d 365, 368 (1994) ("[C]ounsel's choice of witnesses, manner of cross-examination, and lack of objection to testimony fall within the area of tactical, or strategic, decisions, as does counsel's presentation of medical evidence." (citation omitted)). "[S]trategic and tactical decisions will not be second guessed or serve as a basis for post-conviction relief under a claim of ineffective assistance of counsel unless the decision is shown to have resulted from inadequate preparation, ignorance of the relevant law or other shortcomings capable of objective review." *Pratt v. State*, 134 Idaho 581, 584, 6 P.3d 831, 834

(2000) (citation omitted). Dunlap has presented no evidence suggesting that these decisions were the product of inadequate preparation or another shortcoming capable of objective review. We consequently affirm the district court's summary dismissal of this claim.

*f) Medication decisions*

Dunlap claims that he was denied effective assistance of counsel by his attorneys' decisions regarding the medications Dunlap did and did not receive prior to and during his sentencing. Dunlap alleges that he had been receiving Haldol at the Idaho Maximum Security Institution (IMSI) to control his psychosis, but while being held at the county jail, Dunlap's request for bi-weekly Haldol was denied. He further alleges that he unsuccessfully sought counsel's assistance to obtain Haldol (counsel prepared, but never filed, a "Motion for Haldol"). Dunlap now contends that counsels' failure to ensure that he received Haldol likely left him psychotic during the sentencing and, because of interactions with other medications, affected Dunlap's ability to meaningfully assist with his defense.

We hold that Dunlap has failed to demonstrate a genuine issue of material fact as to whether counsel's conduct was deficient. Dunlap's attorney testified that the medication decision was a "strategic move" to show the jury how mentally ill Dunlap was and to avoid Haldol's side-effects of inducing drowsiness. He further explained that it was a team decision, including input from Dr. Beaver. Co-counsel confirmed this explanation, stating they believed it would help the jury understand how serious Dunlap's mental illness was. As the decision was strategic, we affirm the district court's summary dismissal of this claim.

*g) Dunlap's allocution statement*

Dunlap argues that he was denied effective assistance of counsel by his attorneys' decisions regarding the preparation and delivery of his allocution statement. Dunlap alleges that his attorneys failed to help him prepare his allocution statement, and did not review the statement prior to Dunlap reading it to the jury, even though Dunlap's mitigation specialist urged counsel to review it.

These allegations, standing alone, might constitute deficient performance. However, Dunlap's attorney explained the failure to review the statement in advance was the result of Dunlap's failure to provide a copy of his remarks in a timely manner to permit review. Further, counsel had limited ability to control or influence what Dunlap said, as shown by the fact that while giving the statement, Dunlap read from his written statement and then departed from the

prepared text. However, even if we assume that counsel had an affirmative duty to assist Dunlap in the preparation of his allocution–a proposition that Dunlap has not supported by citation to authority–Dunlap has failed to demonstrate how review and input from counsel would have led to a different sentencing outcome. We therefore affirm the district court's summary dismissal of this claim.

### h) Interview with Dr. Matthews

Dunlap argues that he was denied effective assistance of counsel by his attorneys' decision not to attend Dunlap's interview with Dr. Matthews and failure to advise him in preparation for that interview. Dunlap alleges that he was taken from his county jail cell to an interview room where his attorney, a deputy attorney general, and Dr. Matthews, the State's expert, were waiting. Dunlap further alleges that he asked counsel to stay and was told that counsel had a meeting and could not stay and that counsel left before the interview started. Dunlap states that he was not advised as to the nature and scope of the interview, nor offered any advice regarding the interview. Thus, there are two distinct components to this claim, the failure to provide advice before the interview and the failure to attend the interview.

In *Estrada v. State*, this Court discussed the Sixth Amendment right to counsel and concluded that the "right to *assistance* of counsel in the critical stage of a psychosexual evaluation inquiring into a defendant's future dangerousness, does not necessarily require the *presence* of counsel during the exam." 143 Idaho 558, 562, 149 P.3d 833, 837 (2006). Our decision in *Estrada* was based upon the ruling in *Estelle v. Smith*, 451 U.S. 454 (1981), which extended Fifth and Sixth Amendment protections to a defendant subject to psychiatric examinations, the results of which were introduced in the sentencing phase of a capital case. *Id*. at 471. Significantly, however, the U.S. Supreme Court explicitly observed that the decision did not address the presence of counsel during the examination, noting that the Court of Appeals had recognized that "an attorney present during the psychiatric interview could contribute little and might seriously disrupt the examination." *Id*. at 471 n.14. Thus, while counsel was not constitutionally required to be present during Dr. Matthews' interview upon Dunlap's request, they were obligated to prepare Dunlap. Given the conflicting evidence as to whether counsel provided advice to Dunlap in advance of the interview, we hold that Dunlap has demonstrated a genuine issue of material fact as to whether counsel's performance was deficient for failure to provide advice in advance of the interview.

47

In his opening brief, Dunlap did not attempt to identify evidence regarding the effect counsel's failure to advise him in advance of Dr. Matthews' interview had on the outcome of the sentencing proceeding. Similarly, he has not responded to the State's argument pointing out his failure to articulate the manner in which he was prejudiced. Thus, while counsel's failure to prepare and advise Dunlap for the interview would constitute deficient performance, Dunlap has not made the necessary showing under the second *Strickland* prong and we therefore affirm the district court's summary dismissal of the claim.

### i) Presentation of mitigation evidence

Dunlap argues that he was denied effective assistance of counsel by his attorneys' failure to adequately investigate and present mitigation evidence and to adequately rebut the State's aggravation evidence. Trial counsel has a duty to conduct a thorough investigation in preparation for the penalty phase of a capital case. *See, e.g.*, *Porter v. McCollum*, 558 U.S. 30, 130 S.Ct. 447, 452-53 (2009). Presentation of some mitigating evidence, even if strong, is insufficient if other mitigating evidence is available upon reasonable investigation. *Rompilla v. Beard*, 545 U.S. 374, 387-93 (2005). However, no relief is mandated where counsel's investigation is not as thorough as it could have been because the courts "address not what is prudent or appropriate, but only what is constitutionally compelled." *Burger v. Kemp*, 483 U.S. 776, 794 (1987). This Court held, in *State v. Row*, that counsel is not required to investigate a defendant's "entire life in order to objectively present . . . mitigation evidence" and that decisions regarding mental health and allocution statements are "strictly strategic and shall not be second-guessed by this Court." 131 Idaho 303, 313, 955 P.2d 1082, 1092 (1998).

In this case, Dunlap points to several specific areas where he alleges deficient performance in his attorneys' investigation to discover mitigation evidence: Dunlap's family and background, his mental illness and the connection between his medications and his behavior, and his remorse. Further, Dunlap alleges that counsel failed to adequately rebut the State's theory that he was malingering, the State's evidence in support of the propensity aggravator, and the State's expert, Dr. Matthews. While there is no duty to sort through the defendant's "entire life," easily available mitigation evidence cannot be ignored. Taking the allegations as true, and viewing the evidence in the light most favorable to Dunlap, we hold he has demonstrated a genuine issue of material fact as to the deficient performance of counsel.

48

Dunlap has also presented significant evidence of prejudice. For example, counsel failed to present mitigation evidence regarding Dunlap's background and mental health that could have countered the State's theories regarding malingering and intent. Further, there were at least two affidavits by mental health professionals that could have undermined the State's theory that Dunlap was not really mentally ill, but merely malingering. Considering the major role that the question of whether Dunlap is mentally ill played in sentencing proceedings, we hold that Dunlap has demonstrated a genuine issue of material fact as to whether his attorneys' allegedly deficient performance resulted in prejudice. Therefore, because Dunlap has satisfied both prongs of the *Strickland* test, we reverse the district court's summary dismissal of this claim and remand for an evidentiary hearing on this issue.

**2. Other claims.**

*a) Brady/Napue violations*

Dunlap contends that the district court abused its discretion by summarily dismissing his claims of *Brady*/*Napue* violations relating to the State's alleged knowledge and disclosure of information revealed during Dunlap's federal civil rights action against the IMSI. The State has a duty to disclose exculpatory evidence to a defendant. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Specifically, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* Further, "a conviction obtained through use of false evidence, known to be such by representatives of the State," violates the Fourteenth Amendment, as do convictions obtained in proceedings where "the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

The Supreme Court of the United States has since "expanded the duty to include volunteering exculpatory evidence never requested, or requested only in a general way." *State v. Shackelford*, 150 Idaho 355, 380, 247 P.3d 582, 607 (2010) (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)). However, this disclosure is necessary "only when suppression of the evidence would be 'of sufficient significance to result in the denial of the defendant's right to a fair trial'" *Id.* (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976)). By itself, proof that "the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation . . . ." *Id.* (citing *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). Proving a *Brady*

49

violation requires a three-part showing: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Id.* (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). Prejudice is shown where the "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different.'" *Id.* (quoting *Kyles*, 514 U.S at 433). "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Id.*

Dunlap filed a federal civil rights lawsuit against IMSI after his request to be transferred out of solitary confinement was denied. Prison officials, responding to the civil rights claim, asserted that Dunlap's housing was proper, based upon his mental health issues. Both IMSI Warden Fisher and Deputy Attorney General Loomis stated that Dunlap was being incarcerated in the mental health unit, rather than in the general population, because of his mental illness. The prison's chief psychologist, Dr. Sombke, stated that Dunlap had "psychiatric needs" and should not be housed in the general population.

The State defendants in Dunlap's civil suit were represented by the Idaho Attorney General's Office, which also represented the State in Dunlap's capital sentencing proceeding. Dunlap contends that the State was aware of the statements related to Dunlap's mental condition and should have disclosed these exculpatory statements by prison officials to Dunlap. Dunlap points to evidence that, prior to Dunlap's sentencing, there was extensive email communication between Loomis, Fisher, and Sombke, and that the Deputy Attorney General handling Dunlap's sentencing was aware of the communications. Thus, Dunlap does not merely advance conclusory allegations. Rather, based upon the evidence, he has demonstrated the existence of a genuine issue of material fact whether the State was aware of exculpatory evidence that it did not disclose.

The evidence in question here is related to Dunlap's mental health, which was the primary focus of the defense at sentencing. Although we express no opinion regarding the merits of Dunlap's claims, it is clear that an evidentiary hearing was required to determine whether, taken as a whole, there is a reasonable likelihood that timely disclosure of this evidence would have had a substantial effect on Dunlap's mitigation case, especially with respect to rebutting the

State's theory that Dunlap was a malingerer. Therefore, we vacate the district court's summary dismissal as to this claim, and remand for an evidentiary hearing.

*b) Discovery for trigger-pull testing*

Dunlap claims the district court abused its discretion by denying his motion for a discovery order granting him access to the murder weapons for trigger pull testing. In *Hall v. State*, this Court held that whether "to authorize discovery during post-conviction relief is a matter left to the sound discretion of the district court," and is only mandatory where "discovery is necessary to protect an applicant's substantial rights . . . ." 151 Idaho 42, 45, 253 P.3d 716, 719 (2011) (quoting *Baldwin v. State*, 145 Idaho 148, 157, 177 P.3d 362, 371 (2008) (citation omitted)). Before any post-conviction applicant will be permitted to conduct discovery, the applicant "must identify the specific subject matter where discovery is requested and why discovery as to those matters is necessary to his or her application." *Id.* (quoting *State v. LePage*, 138 Idaho 803, 810, 69 P.3d 1064, 1071 (Ct. App. 2003)).

Dunlap alleges that he needed access to the weapons to support his claim that he was confused by the different trigger-pulls of the crossbow and shotgun, and that he pulled the shotgun trigger when startled because of his experience with the less-sensitive crossbow. He asserts that this is necessary to rebut the "specific intent" aggravator, and that discovery is therefore mandatory. We hold that Dunlap has failed to show that the district court abused its discretion. At resentencing, the State's expert testified that the shotgun trigger-pull was within the manufacturer's specifications and that the test did not indicate an unusually sensitive trigger. Further, after fourteen years in police custody, there is no assurance that the current trigger-pull would accurately reflect the trigger-pull at the time of the killing, even though the weapons had not been altered. Dunlap has not shown that the State's testing was flawed or that there is new technology that could make additional testing more reliable. Therefore, we affirm the district court's summary dismissal of this claim.

*c) Motion to disqualify Judge Harding*

Dunlap argues that Judge Harding abused his discretion by denying Dunlap's motion to disqualify himself for cause. Denial of a motion for disqualification of a judge is reviewed under an abuse of discretion standard. *State v. Sivak*, 127 Idaho 387, 389, 901 P.2d 494, 496 (1995). A judge may be disqualified for cause where it is shown "[t]hat the judge . . . is biased or prejudiced for or against any party or the case in the action." I.R.C.P. 40(d)(2)(A)(4). However,

51

"a judge may not be disqualified for prejudice unless it is shown that the prejudice is directed against the party and is of such nature and character as would render it improbable" that the party would receive a fair and impartial trial. *Pizzuto v. State*, 134 Idaho 793, 799, 10 P.3d 742, 748 (2000). In post-conviction proceedings, allegations of prejudice "must state facts that do more than simply explain the course of events involved in a criminal trial." *Id.*

In this case, Dunlap's motion cited Judge Harding's concern over the financial impact to the county because of his responsibility for approving Dunlap's attorneys' requests for funding, that he was a necessary witness to address Dunlap's claim that counsel in the resentencing hearing were ineffective for failing to request the appointment of a "money judge" because he could testify as to communications he had with county commissioners, and that Judge Harding had "conflicting allegiances" because his decisions could affect his reelection prospects. In *State v. Wood*, 132 Idaho 88, 100, 967 P.2d 702, 714 (1998), this Court quoted its earlier decision in *State v. Olin*, 103 Idaho 391, 395, 648 P.2d 203, 207 (1982): "It is thus incumbent upon the trial court to inquire into the needs of the defendant and the circumstances of the case, and then make a determination of whether an adequate defense will be available to the defendant without the requested expert or investigative aid." Judge Harding's earlier expressions of concern relating to the costs of Dunlap's defense were made in the course of performance of his duties as a trial judge. In *Bach v. Bagley*, 148 Idaho 784, 229 P.3d 1146 (2010), we considered a claim of bias based upon earlier proceedings in the litigation. We took guidance from the U.S. Supreme Court's decision in *Liteky v. United States*, 510 U.S. 540 (1994).

> It is enough for present purposes to say the following: First, judicial rulings alone almost never constitute valid basis for a bias or partiality motion . . . and can only in the rarest circumstances evidence the degree of favoritism or antagonism required. . . . Almost invariably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. . . .

*Id.* at 555–56. We conclude that Judge Harding's earlier expressions of concern relating to the costs of Dunlap's defense did not require his recusal.

The other two grounds advanced by Dunlap warrant less discussion. Judge Harding was not a necessary witness in the post-conviction relief proceedings. If Dunlap had wished to secure

evidence regarding his conversations with the Caribou County Commissioners, he could have obtained that evidence from the commissioners. Dunlap's speculation that Judge Harding would be biased in the post-conviction relief proceedings because of concerns for his reelection are without merit because Judge Harding retired shortly after granting the State's motion for summary dismissal. Thus, we hold that Dunlap has failed to demonstrate that Judge Harding abused his discretion by denying the motion for disqualification.

*d) Judicial bias*

Dunlap argues that the district court's decision to grant the State's motion for summary dismissal was improperly influenced by Judge Harding's personal schedule and private commitments. Six days after issuing the order summarily dismissing Dunlap's post-conviction relief claims, Judge Harding left the United States to serve a two-year mission for his church. Judge Harding's order of summary dismissal came more than five months after hearing on the State's motion for summary dismissal. Given that Judge Harding wrote a 72-page opinion explaining the reasons for his grant of summary dismissal, even taking all reasonable inferences in favor of Dunlap, we are unable to find that there is a genuine issue of material fact as to Judge Harding's bias.

*e) Juror bias and extrinsic evidence*

Dunlap contends that the district court erred by summarily dismissing his claim that the jury's consideration of extrinsic evidence and the jury pool's exposure to biased statements by some potential jurors violated his constitutional right to a fair trial. "To justify a post-conviction evidentiary hearing, the petitioner must make a factual showing based on admissible evidence." *Sivak v. State*, 134 Idaho 641, 646, 8 P.3d 636, 641 (2000) (citing *McKinney v. State*, 133 Idaho 695, 700, 992 P.2d 144, 149 (1999)). "When a motion for a new trial is made because of juror misconduct, the district court must determine whether there has been 'a showing that prejudice reasonably could have occurred.'" *Leavitt v. Swain*, 133 Idaho 624, 629, 991 P.2d 349, 354 (1999) (citation omitted).

In this case, Dunlap's evidence is an unsigned affidavit, and thus it is not admissible evidence. I.R.C.P. 56(e). Consequently, Dunlap has not properly demonstrated the existence of a genuine issue of material fact. Thus, we affirm the district court's summary dismissal of this claim.

## V. CONCLUSION

Although we have found error in the direct appeal from the sentencing proceedings, we hold that those errors, individually and cumulatively, are harmless. We therefore affirm the judgment sentencing Dunlap to death. As to the appeal from the order summarily dismissing Dunlap's petition for post-conviction relief, we hold that the district court erred in summarily dismissing Dunlap's claim of ineffective assistance of counsel regarding the investigation and presentation of mitigating evidence and the rebuttal of the State's evidence in aggravation and Dunlap's *Brady/Napue* claim. Therefore, we vacate the district court's judgment granting summary dismissal of Dunlap's petition for post-conviction relief and remand the matter for an evidentiary hearing on those issues.

Chief Justice BURDICK and Justices EISMANN, J. JONES and W. JONES **CONCUR**.